IN RE APPLICATIONS 15146 AND 15148
OF THE LITTLE BLUE NATURAL RESOURCES DISTRICT.
LITTLE BLUE NATURAL RESOURCES DISTRICT,
APPELLEE, V. LOWER PLATTE NORTH NATURAL
RESOURCES DISTRICT ET AL., APPELLANTS.

317 N.W.2d 726

Filed March 19, 1982.   No. 44050.

George E. Svoboda, P.C., for appellants Lower Platte North et al.

James I. Shamberg of Cronin, Shamberg & Wolf for appellants Central Platte N.R.D., Wood River, Marcia Oldfather, Leslie & Charlotte A. Robinson, City of Lexington, Spring Creek Citizens Committee, County of Merrick, County of Dawson, City of Kearney, Harold Green, Jr., James B. Beltzer, John A. Wagoner, Joseph D. Martin, & Herbert F. Mayer, Jr.

William F. Austin, City Attorney, and William G. Blake for appellant City of Lincoln.

Martin D. Johnson for appellant City of Grand Island.

Duane A. Burns of Mayer & Burns for appellant Central Nebraska Conservation Assn.

Lyle B. Gill for appellant City of Fremont.

Patrick A. Parenteau for appellants National Wildlife Federation, Neb. Wildlife Federation, & Save the Platte Committee.

David C. Nuttleman of Holtorf, Hansen, Kovarik & Nuttleman for appellant North Platte N.R.D.

Jess C. Nielsen and Richard A. Birch of Jess C. Nielsen Law Offices for appellants Twin Platte N.R.D. et al.

Robert B. Crosby and Steven G. Seglin of Crosby, Guenzel, Davis, Kessner & Kuester for appellee.

Heard before KRIVOSHA, C.J., BOSLAUGH, MCCOWN, CLINTON, BRODKEY, WHITE, and HASTINGS, JJ.

KRIVOSHA, C.J.

The appellants, who are various Nebraska municipalities, natural resources districts, a conservation

district, and several environmental organizations, have appealed from an order entered by the director of the Department of Water Resources (Department) which in substance granted to the appellee, Little Blue Natural Resources District (Little Blue), the authority to appropriate, under conditions prescribed in the order, waters of the North Platte River for a proposed irrigation project to be constructed by Little Blue. For reasons which we will set out in greater detail, we find that we must reverse the order of the Department's director and remand the matter back to the director for further proceedings in accordance with this opinion.

This is the second appearance of this matter before this court. The facts are fully set out in our first opinion at 206 Neb. 535, 294 N.W.2d 598 (1980) (Little Blue I), and will not be repeated herein. The effect of our order in Little Blue I was to require the director to determine whether the taking of the water contemplated by Little Blue for its proposed project should be denied because such denial was demanded by the public interest, as required by Neb. Const. art. XV, § 6. Following our decision in Little Blue I, the director instructed all the interested parties to prepare and submit briefs to him addressing only the issue of "public interest" as it pertains to the proposal of Little Blue. No further hearings were held by the director and no further testimony taken, though the appellants requested the opportunity to present additional evidence to the director.

A number of errors are assigned by appellants. Before we turn to those matters, however, it is necessary that we first address a threshold question, not required to be addressed by us in Little Blue I, concerning the significance of the provisions of Neb. Rev. Stat. §§ 37-430 to 37-438 (Reissue 1978) and cited as The Nongame and Endangered Species Conservation Act (Act). Unless we determine that the Act has no applica-

tion to the instant project or, if applicable, its provisions were satisfied, we need not address any of the other errors assigned.

In 1973 the Congress of the United States enacted the Endangered Species Act of 1973. See 16 U.S.C. §§ 1531 et seq. (1976 & Supp. III 1979). Under the provisions of the federal Endangered Species Act, states were required to pass similar endangered species legislation in order to continue receiving certain federal funds. As a result, in 1975 the Nebraska Legislature adopted the above-cited Act. 1975 Neb. Laws, L.B. 145.

The purpose of the Act is spelled out in § 37-432, which provides in part: "The Legislature finds and declares: . . . (2) That species of wildlife and wild plants normally occurring within this state which may be found to be threatened or endangered within this state shall be accorded such protection as is necessary to maintain and enhance their numbers." The pertinent portion of the Act, which is found in § 37-435(3), reads as follows: "The Governor *shall* review other programs administered by him and utilize such programs in furtherance of the purposes of sections 37-430 to 37-438. *All other state departments and agencies shall, in consultation* with and with the assistance of the commission, utilize their authorities in furtherance of the purposes of sections 37-430 to 37-438 by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 37-434, *and by taking such action necessary to insure that actions authorized, funded, or carried out by them do not jeopardize the continued existence of such endangered or threatened species or result in the destruction or modification of habitat of such species which is determined by the commission to be critical.*" (Emphasis supplied.) The commission referred to in the Act is defined by statute as the Nebraska Game and Parks Commission. See § 37-431(2).

Pursuant to the federal Endangered Species Act and the state Act, certain species have been declared to be endangered species, including the whooping crane and the bald eagle, both of whom either roost upon or in some manner use the Platte River area as a habitat. 50 C.F.R. § 17.11 (1980); Neb. Game and Parks Comm. Wildlife Reg. 6-4(a) (1981). There may be others.

The Act imposes two obligations on all state departments and agencies. One is that all state departments and agencies must, *after consulting* with Game and Parks, carry out programs for the conservation of endangered species, and the second is that all state departments and agencies must not take any action that will result in jeopardizing the continued existence of endangered or threatened species or result in the destruction or modification of a habitat of such species. § 37-435(3).

There is no question but that the Department of Water Resources is a department or agency within the meaning of § 37-435(3). Neb. Rev. Stat. § 46-705 (Reissue 1978). Furthermore, Little Blue, as a creature of statute and a political subdivision, is also an agency within the meaning of § 37-435(3) and bound by its provisions. Neb. Rev. Stat. § 2-3213(1) (Cum. Supp. 1980). *Schlientz v. City of North Platte,* 172 Neb. 477, 110 N.W.2d 58 (1961); *Vap v. City of McCook,* 178 Neb. 844, 136 N.W.2d 220 (1965); *Seward County Rural Fire Protection Dist. v. County of Seward,* 156 Neb. 516, 56 N.W.2d 700 (1953). Likewise, it seems clear beyond question that the development of the irrigation project by Little Blue and the issuance of a permit by the Department to Little Blue both qualify as "action" taken by a state agency and, therefore, may not jeopardize the continued existence of the endangered species or result in the destruction or modification of their habitat.

The director, in his order issued following our remand in Little Blue I, found, among other matters: "The potential affects [sic] to [fish and wildlife habitat]

either are deemed minimal *or would be mitigated* by offsetting or even enhancing circumstances derived from operation of the proposed project." (Emphasis supplied.) Neither the meaning of that finding in light of the restrictions of the Act nor the basis for that finding and the director's attempt to balance interests is made clear from the order. Nor can one determine what the effect of this project will be on the habitat of the endangered species involved by examining the voluminous record in this case. We are simply unable to determine from the record in its present state whether the proposed project will in fact jeopardize the continued existence of such endangered or threatened species or result in the destruction or modification of habitat of such species, contrary to the prohibitions contained in § 37-435(3). There is some evidence in the record to indicate that the habitats may be affected by the project. The extent of that effect and how it applies when examined in light of the Act is not shown so that we can determine if the Act is being violated. What is clear, however, is that the examination that has been made by both the Department and Little Blue is inadequate, and further evidence is required.

We should note at this point that the provisions of the Act may not repeal the provisions of Neb. Const. art. XV, §§ 4, 5, and 6. To the extent that the prohibition contained in the Act denied to a citizen of the State of Nebraska a right otherwise guaranteed to the citizen, the Act would have to give way. That issue is not before us at this time and we do not consider what conflicts between the Act and the Constitution of Nebraska may arise. Absent a constitutional conflict, however, the requirements imposed upon a state agency by the Act, as presently enacted, are rather clear and may not be either ignored or waived.

The relevant section of the state Act is, for all practical purposes, identical with the federal act on the same subject, and therefore the decisions of the federal

courts, including the U.S. Supreme Court, in interpreting the federal act are of great help to us in deciding this case. The U.S. Supreme Court in its decision in *TVA v. Hill*, 437 U.S. 153, 98 S. Ct. 2279, 57 L. Ed. 2d 117 (1978), put to rest any doubt as to how the act is to be applied. The issue in the *TVA* case was whether the Tennessee Valley Authority could complete the construction of the Tellico Dam on the Little Tennessee River once it was determined that the critical habitat of the snail darter would be totally eliminated by completion of the dam. At the time that the snail darter's existence near the damsite was first determined, millions of dollars had already been spent on the dam's construction, which was nearly completed. In enjoining the completion of the dam, the U.S. Supreme Court said at 173: "One would be hard pressed to find a statutory provision whose terms were any plainer than those in § 7 of the Endangered Species Act. Its very words affirmatively command all federal agencies 'to *insure* that actions *authorized, funded,* or *carried out* by them do not *jeopardize* the continued existence' of an endangered species or '*result* in the destruction or modification of habitat of such species . . . .' 16 U.S.C. § 1536 (1976 ed.). (Emphasis added.) This language admits of no exception." Section 7 of the federal act is almost identical with § 37-435(3) of the state Act.

The U.S. Supreme Court concluded that the history of the act clearly required the courts to follow the mandates of the legislation, regardless of what the courts might think. The Court said at 179-80: "In shaping legislation to deal with the problem thus presented, Congress started from the finding that '[t]he two major causes of extinction are hunting and destruction of natural habitat.' S. Rep. No. 93-307, p. 2 (1973). Of these twin threats, Congress was informed that the greatest was destruction of natural habitats; see 1973 House Hearings 236 (statement of Associate Deputy Chief for National Forest System, Dept. of

Agriculture); *id.*, at 241 (statement of Director of Mich. Dept. of Natural Resources); *id.*, at 306 (statement of Stephen R. Seater, Defenders of Wildlife); Lachenmeier, The Endangered Species Act of 1973: Preservation or Pandemonium?, 5 Environ. Law 29, 31 (1974). Witnesses recommended, among other things, that Congress require all land-managing agencies 'to avoid damaging critical habitat for endangered species and to take positive steps to improve such habitat.' 1973 House Hearings 241 (statement of Director of Mich. Dept. of Natural Resources). Virtually every bill introduced in Congress during the 1973 session responded to this concern by incorporating language similar, if not identical, to that found in the present § 7 of the Act. These provisions were designed, in the words of an administration witness, 'for the first time [to] *prohibit* [a] federal agency from taking action which does jeopardize the status of endangered species,' Hearings on S. 1592 and S. 1983 before the Subcommittee on Environment of the Senate Committee on Commerce, 93d Cong., 1st Sess., 68 (1973) (statement of Deputy Assistant Secretary of the Interior) (emphasis added); furthermore, the proposed bills would '*direc[t]* all . . . Federal agencies to utilize their authorities for carrying out programs *for the protection* of endangered animals.' 1973 House Hearings 205 (statement of Assistant Secretary of the Interior). (Emphasis added.)

"As it was finally passed, the Endangered Species Act of 1973 represented the most comprehensive legislation for the preservation of endangered species ever enacted by any nation. Its stated purposes were 'to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved,' and 'to provide a program for the conservation of such . . . species . . . .' 16 U.S.C. § 1531(b) (1976 ed.). In furtherance of these goals, Congress expressly stated in § 2(c) that 'all Federal departments and agencies *shall* seek *to conserve*

*endangered species* and threatened species . . . .' 16 U.S.C. § 1531(c) (1976 ed.). (Emphasis added.) Lest there be any ambiguity as to the meaning of this statutory directive, the Act specifically defined 'conserve' as meaning 'to use and the use of *all·methods and procedures which are necessary* to bring *any endangered species* or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary.'"

The U.S. Supreme Court went on to make further comment concerning the manner in which the act is to be administered, saying at 183-84: "While the Conference Report made no specific reference to this choice of provisions, the House manager of the bill, Representative Dingell, provided an interpretation of what the Conference bill would require, making it clear that the mandatory provisions of § 7 were not casually or inadvertently included:

"'[Section 7] substantially amplifie[s] the obligation of [federal agencies] to take steps within their power to carry out the purposes of this act. A recent article . . . illustrates the problem which might occur absent this new language in the bill. It appears that the whooping cranes of this  country, perhaps the best known of our endangered species, are being threatened by Air Force bombing activities along the gulf coast of Texas. Under existing law, the Secretary of Defense has some discretion as to whether or not he will take the necessary action to see that this threat disappears . . . . [O]nce the bill is enacted, [the Secretary of Defense] *would be required to take the proper steps. . . .'*

"'. . . [T]he agencies of Government can no longer plead that they can do nothing about it. *They can, and they must. The law is clear.*'"

In recognizing that the Court was required to follow the dictates of the legislation and not view the matter as merely de minimis, the U.S. Supreme Court said at 187-88: "One might dispute the applica-

bility of these examples to the Tellico Dam by saying that in this case the burden on the public through the loss of millions of unrecoverable dollars would greatly outweigh the loss of the snail darter. But neither the Endangered Species Act nor Art. III of the Constitution provides federal courts with authority to make such fine utilitarian calculations. On the contrary, the plain language of the Act, buttressed by its legislative history, shows clearly that Congress viewed the value of endangered species as 'incalculable.' Quite obviously, it would be difficult for a court to balance the loss of a sum certain—even $100 million—against a congressionally declared 'incalculable' value, even assuming we had the power to engage in such a weighing process, which we emphatically do not."

Just as the U.S. Supreme Court was without choice when examining the effect of the federal Endangered Species Act and balancing it against the benefits of the nearly completed Tellico Dam, likewise, this court is without choice, in examining the effect of the state Act, to engage in such balancing. The requirements of the Act are absolute and must be met. That there may be offsetting or even enhancing circumstances derived from the operation of the project may be insufficient if the endangered species habitat is destroyed, as the Act now stands.

No action of a state department or agency nor program administered by the Governor can be permitted as long as § 37-435(3) is in effect until the interested parties have consulted with Game and Parks *and* have determined that the action contemplated will not jeopardize the continued existence of such endangered species or result in destruction or modification of habitat of such species.

We pause at this point to clearly point out that we do not, by our action today, determine that the project does indeed violate the Act. We merely decide as we do because the record before us fails to disclose that the Department and Little Blue adequately consulted with

and sought the assistance of Game and Parks in planning the project, and for the further reason that the record before us fails to disclose that the actions contemplated by both Little Blue, in constructing its project, and the Department, in authorizing the project, will not "jeopardize the continued existence of such endangered or threatened species or result in the destruction or modification of habitat of such species which is determined by the commission to be critical." Until the record contains sufficient evidence upon which such determination can be made, in the first instance by the director, and if necessary on appeal by this court, the project must be halted and the cause remanded for further proceedings.

In view of our action herein, we believe it advisable to comment on what is meant when the Act requires the parties to "consult" with the commission. The consultation required by the Act does not grant to Game and Parks absolute veto. In *National Wildlife Federation v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976), the court said: "Federal agencies are required to consult and obtain the assistance of the Secretary before taking any actions which may affect endangered species or critical habitat. However, once an agency has had *meaningful* consultation with the Secretary of Interior concerning actions which may affect an endangered species the final decision of whether or not to proceed with the action lies with the agency itself. Section 7 does not give the Department of Interior a veto over the actions of other federal agencies, provided that the required consultation has occurred." (Emphasis supplied.) See, also, *Sierra Club v. Froehlke*, 534 F.2d 1289 (8th Cir. 1976).

While Game and Parks, therefore, does not have absolute veto, it is clear from the Act that meaningful consultation is an absolute prerequisite to proceeding with any project. Moreover, because the commission does not have power of veto does not mean that either the Department or Little Blue can ignore the effect

of the project on the endangered species if in fact the evidence supports that conclusion.

In *National Wildlife Federation v. Coleman, supra* at 373, the court further noted: "In holding that the appellees have 'adequately considered' the effects of the highway on the crane, the district court misconstrued the directive of § 7. As we have pointed out, § 7 imposes on all federal agencies the mandatory obligation to insure that any action authorized, funded, or carried out by them does not jeopardize the existence of an endangered species or destroy critical habitat of such species. . . . Although the FEIS and the administrative record indicates that the appellees have recognized and considered the danger the highway poses to the crane, they have failed to take the necessary steps 'to insure' that the highway will not jeopardize the crane or modify its habitat." The court therefore enjoined the project and directed that the Department of Interior take a closer look at what effect, if any, construction of a highway upon the habitat of the crane would have.

The court further noted in *Coleman* that if the agency disregarded the evidence, the court would be required to review the matter, saying at 371-72: "It follows that after consulting with the Secretary the federal agency involved must determine whether it has taken all necessary action to insure that its actions will not jeopardize the continued existence of an endangered species or destroy or modify habitat critical to the existence of the species. Once that decision is made it is then subject to judicial review to ascertain whether 'the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S. Ct. at 824, 28 L. Ed. 2d at 153. See Title 16, U.S.C., Section 1540(g)."

In view of the fact that we are remanding this matter back to the director for further proceedings,

we deem it appropriate to comment on one further matter. Since our decision in Little Blue I, the Legislature of the State of Nebraska has amended the provisions of Neb. Rev. Stat. §§ 46-204, 46-206, 46-234, and 46-235 (Supp. 1981), all relating to transbasin diversion. 1981 Neb. Laws, L.B. 252. In particular, the Legislature has amended § 46-235 to provide that certain criteria are to be considered by the director in determining whether the public interest as required by the Constitution is met. Neb. Const. art. XV, § 6.

The substantive right to divert the water unless the public interest demands otherwise is found in the Constitution and cannot be denied by statute. Neb. Const. art. XV, § 6; *Little Blue N.R.D. v. Lower Platte North N.R.D.*, 206 Neb. 535, 294 N.W.2d 598 (1980). The function of Neb. Rev. Stat. § 46-289 (Supp. 1981) is to establish in part the procedure to be followed by the director in attempting to determine whether a denial of the application is demanded by the public interest. As such, § 46-289 is a procedural law and not a substantive law, and is to be applied to hearings held after the passage of the Act even though the application was filed prior to the passage of the procedural law. See, *Romano v. B. B. Greenberg Co.*, 108 R.I. 132, 273 A.2d 315 (1971); *Schultz v. Gosselink*, 260 Iowa 115, 148 N.W.2d 434 (1967).

In 2 Am. Jur. 2d *Administrative Law* § 326 at 149 (1962), it provides in part: "An administrative agency is required to act under the law as it stands when its order is entered. A change of law pending an administrative determination must be followed and the new law applied, at least in relation to permits for the doing of future acts, unless the statute contains a saving clause."

And in *Oviatt v. Archbishop Bergan Mercy Hospital*, 191 Neb. 224, 226, 214 N.W.2d 490, 492 (1974), we said: "[A]mendments to statutes which are procedural in nature are applicable to pending cases which have

not been tried." See, also, *Ziffrin, Inc. v. United States*, 318 U.S. 73, 63 S. Ct. 465, 87 L. Ed. 621 (1943).

We believe that, upon remand, further hearings should be held by the director and relevant evidence should be adduced relating particularly to those factors set forth in § 46-235 as now amended, as well as the project's effect upon the endangered species. In so holding we do not pass upon the validity of § 46-235.

The action of the director is therefore reversed and the matter is remanded for further proceedings in accordance with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.