IN RE APPLICATIONS A-17004, A-17005, A-17006, A-17007, A-17008, AND A-17009 OF THE CENTRAL PLATTE NATURAL RESOURCES DISTRICT.
CENTRAL PLATTE NATURAL RESOURCES DISTRICT, APPELLEE AND CROSS-APPELLEE, v. STATE OF WYOMING, APPELLANT, CENTRAL NEBRASKA PUBLIC POWER AND IRRIGATION DISTRICT, APPELLEE AND CROSS-APPELLANT, AND LOWER PLATTE NORTH NATURAL RESOURCES DISTRICT ET AL., APPELLEES.

512 N.W.2d 392

Filed July 6, 1993.    No. A-92-664.

Dennis C. Cook, Senior Assistant Wyoming Attorney General, and Donald M. Gerstein; Lawrence J. Wolfe, of Holland & Hart; and James W. Hewitt for appellant.

James E. Doyle IV, of Cook, Wightman & Doyle, for appellee Central Platte Natural Resources District.

Michael C. Klein, of Anderson, Klein, Peterson & Swan, for appellee Central Nebraska Public Power and Irrigation District.

George E. Svoboda, of Sidner, Svoboda, Schilke, Thomsen, Holtorf & Boggy, for appellee Lower Platte North Natural Resources District.

Glen A. Murray for appellees National Audubon Society and Nebraska Chapter of the Sierra Club.

SIEVERS, Chief Judge, and HANNON and IRWIN, Judges.

IRWIN, Judge.

This is a direct appeal by the State of Wyoming (Wyoming) pursuant to Neb. Rev. Stat. § 46-210 (Cum. Supp. 1992) from a July 2, 1992, order of Nebraska's Director of Water Resources (Director), in which order the Director approved instream flow applications by Central Platte Natural Resources District (Central Platte NRD).

In its assignments of error, Wyoming claims that (1) the Director's determination that unappropriated water is available for the requested flows was made in excess of his statutory authority, was based on unlawful procedure, is unsupported by competent and relevant evidence, and is arbitrary and capricious; (2) the Director's determination that there is an absence of evidence in the record indicating that senior water rights would be affected amounts to a showing that Central Platte NRD failed in its evidentiary burden; (3) the Director disregarded statutory requirements and relied upon incompetent evidence in finding that the applications are in the

public interest; and (4) the Director's refusal to subpoena Dr. Ann Bleed to testify or to disqualify her from participating in the hearing, or both, denied the objectors their right to a fair hearing.

## I. FACTS

On July 25, 1990, Central Platte NRD filed six applications for permits to appropriate water for instream flows in the Platte River. In his order, the Director summarized the applications as follows:

> Together, the six applications seek the State's authority for Central Platte to maintain certain river flows in a reach of the Platte River generally extending between Lexington and Columbus. The ultimate objective is to maintain habitat for five bird species. Except for sandhill cranes, all have been officially designated as threatened or endangered. [It is not required that fish or wildlife be threatened or endangered to be the subject of an instream flow application.] Flows specified in each application would either be a factor in providing bird habitat in the Platte valley or be a factor in providing habitat for food sources consumed by the birds. Each application and accompanying materials specified certain flows and river reaches. Particular species and other information were also identified. With one exception, each application specifies several time intervals.

Application A-17004 sought a year-round appropriation to maintain fish (such as sand shiner, plains killifish, and flathead minnow) as a food supply for least terns and to maintain macroinvertebrates as a food supply for piping plovers. Applications A-17005 and A-17006 sought winter flows to maintain food sources for bald eagles. Applications A-17007, A-17008, and A-17009 sought late-winter flows to initiate wet-meadow activity and sought spring and fall flows to maintain habitat for migrating sandhill cranes and whooping cranes. The accompanying chart, which was attached to the Director's order, is included on the following pages to assist the reader.

| APPLI-CATION | TIME PERIOD | PURPOSE |
|---|---|---|
| A-17004a | Jan. 1 – June 23 | Maintain Fish/Macroinvertebrates as Food Sources |
| b | June 24 – Aug. 22 | Maintain Fish/Macroinvertebrates as Food Sources |
| c | Aug. 23 – Dec. 31 | Maintain Fish/Macroinvertebrates as Food Sources |
| A-17005a | Jan. 1 – Feb. 25 | Maintain Fish/Waterfowl as Food Sources |
| b | Dec. 10 – Dec. 31 | Maintain Fish/Waterfowl as Food Sources |
| A-17006a | Jan. 1 – Feb. 25 | Maintain Fish/Waterfowl as Food Sources |
| b | Dec. 10 – Dec. 31 | Maintain Fish/Waterfowl as Food Sources |
| A-17007a | Feb. 15 – Feb. 28 | Initiate Biological Activity |
| b | Mar. 1 – Mar. 31 | Maintain Staging/Roosting Habitat |
| c | Oct. 1 – Oct. 11 | Maintain Staging/Roosting Habitat |
| A-17008a | Apr. 1 – Apr. 14 | Maintain Staging/Roosting Stopover Habitat |
| b | Apr. 15 – May 3 | Maintain Staging/Roosting Stopover Habitat |
| c | Oct. 12 – Nov. 10 | Maintain Staging/Roosting Stopover Habitat |
| A-17009 | Apr. 1 – Apr. 14 | Maintain Staging/Roosting Habitat |

*In cubic feet per second (cfs)

| SPECIES TO BE BENEFITTED | REACH | FLOW REQUESTED* |
|---|---|---|
| Terns/Plovers | J-2 Mouth – Columbus | 500 |
| Terns/Plovers | J-2 Mouth – Columbus | 600 |
| Terns/Plovers | J-2 Mouth – Columbus | 500 |
| Bald Eagles | J-2 Wasteway Gate to Mouth | 750 |
| Bald Eagles | J-2 Wasteway Gate to Mouth | 750 |
| Bald Eagles | J-2 Mouth – Elm Creek | 1,100 |
| Bald Eagles | J-2 Mouth – Elm Creek | 1,100 |
| Whooping/Sandhill Cranes | J-2 Mouth – Chapman | 1,100 |
| Sandhill Cranes | J-2 Mouth – Chapman | 1,100 |
| Sandhill Cranes | J-2 Mouth – Chapman | 1,100 |
| Whooping/Sandhill Cranes | J-2 Mouth – Grand Island | 1,300 |
| Whooping Cranes | J-2 Mouth – Grand Island | 1,500 |
| Whooping Cranes | J-2 Mouth – Grand Island | 1,500 |
| Sandhill Cranes | Grand Island – Chapman | 1,100 |

Notice of the applications was published by the Department of Water Resources (Department) as provided in Neb. Rev. Stat. § 46-2,114 (Reissue 1988). Wyoming filed its objection to the applications on October 2, 1990. Wyoming's interest in the applications is based upon its ownership of approximately 438 acres of property along the Platte River. The property is located in Buffalo and Kearney Counties and consists of approximately 328 acres of Platte River channel (including islands and accreted areas within the flood plain) and 110 acres of pasture and land adjacent to the river. The property is to be developed and managed as "whooping crane migrational habitat as a condition of the Army Corps of Engineers Clean Water Act §404 Permit for the construction of the Deer Creek Reservoir Project in Wyoming." Wyoming filed a request to be made a party pursuant to 454 Neb. Admin. Code, ch. 4, § 001.02B (1989). See, also, Neb. Rev. Stat. § 25-328 (Reissue 1989).

Some 17 other parties also filed objections. Three of these parties withdrew, four were dismissed, and two changed their status from opponents to proponents during the hearings. Objectors Central Nebraska Public Power and Irrigation District, Lower Platte North Natural Resources District, the National Audubon Society, and the Nebraska chapter of the Sierra Club submitted briefs in this appeal. The other remaining objectors did not file briefs, and they are not involved in this appeal.

Hearings on the applications commenced on July 1, 1991, in Lincoln, Nebraska. The hearings adjourned on July 18 and reconvened on September 16. The hearings closed on September 25. During the hearings, Wyoming requested the Director to subpoena Dr. Ann Bleed, hydrologist for the State of Nebraska, to appear as a witness. Dr. Bleed is one of the authors of a report entitled "Economic, Environmental and Financing Optimization Analysis of Platte River Development Alternatives," which was published by the Nebraska Water Resources Center in 1986, and Wyoming maintained that the conclusion of the report contained a preference for instream flows similar to those sought by the applications in this case. The Director refused to issue the subpoena because of Dr. Bleed's role as examiner at the hearings. Later, Wyoming moved

to have Dr. Bleed disqualified from participating in the hearings. Stating that Dr. Bleed was not involved in the decisionmaking process, the hearing officer denied the motion. In January 1992, the parties submitted written final arguments.

On July 2, 1992, the Director issued his order granting three of the applications, granting in part and denying in part one application, denying one application, and dismissing one application. The Director found that Central Platte NRD had met its burden of proof for applications A-17004, A-17008, and A-17009 and approved them. For the part of application A-17007 requesting a flow of 1,100 cubic feet per second (cfs) from February 15 to February 28, the Director found that the evidence failed to support a finding that the appropriation was necessary to maintain the instream use for which the appropriation had been requested and denied that part of the application. The Director dismissed A-17005 because the application requested an instream appropriation for waters in a manmade waterway. Under Neb. Rev. Stat. § 46-2,108 (Reissue 1988), an instream appropriation is the undiverted application of the waters of a *natural stream*. As to A-17006, the Director found that Central Platte NRD had not met its burden of proof and, therefore, denied that application.

## II. BACKGROUND

Generally, the term "instream appropriation" means "the undiverted application of the waters of a natural stream within or bordering upon the state for recreation or fish and wildlife purposes." § 46-2,108. All appropriations for water must be for a beneficial purpose. Neb. Rev. Stat. § 46-229 (Reissue 1988). The instream use of water for recreation or fish and wildlife is considered a beneficial use of water. § 46-2,108. An instream appropriation may be obtained only by a natural resources district or the Game and Parks Commission and only for the amount of water necessary for recreation or fish and wildlife. *Id.*

Neb. Rev. Stat. § 46-2,115 (Reissue 1988) provides that

[a]n application for an instream appropriation shall be approved by the Director of Water Resources if he or she finds that:

(1) There is unappropriated water available to provide for the instream appropriation;

(2) The appropriation is necessary to maintain the instream use or uses for which the appropriation has been requested;

(3) The appropriation will not interfere with any senior surface water appropriation;

(4) The rate and timing of the flow is the minimum necessary to maintain the instream use or uses for which the appropriation has been requested; and

(5) The application is in the public interest.

The application may be granted for a rate of flow that is less than that requested by the applicant or for a shorter period of time than requested by the applicant.

The burden of proof is on the applicant. Neb. Rev. Stat. § 46-209 (Cum. Supp. 1992).

## III. STANDARD OF REVIEW

The proper standard of review for an appellate court to follow in cases involving appeals from the Department under the provisions of § 46-210 is to search only for errors appearing in the record, i.e., to determine whether the judgment conforms to law, is supported by relevant evidence, and is not arbitrary, capricious, or unreasonable. *In re Applications A-16027 et al.*, 242 Neb. 315, 495 N.W.2d 23 (1993). See, also, *In re Applications T-61 and T-62*, 232 Neb. 316, 440 N.W.2d 466 (1989); *In re Applications A-15145, A-15146, A-15147, and A-15148*, 230 Neb. 580, 433 N.W.2d 161 (1988); *In re Application A-15738*, 226 Neb. 146, 410 N.W.2d 101 (1987).

A decision is arbitrary when it is made in disregard of the facts or circumstances and without some basis which would lead a reasonable person to the same conclusion. [Citations omitted.] A capricious decision is one guided by fancy rather than by judgment or settled purpose; such a decision is apt to change suddenly; it is freakish, whimsical, humorsome. [Citations omitted.] The term "unreasonable" can be applied to an administrative decision only if the evidence presented leaves no room for differences of opinion among reasonable minds.

*In re Application A-16642*, 236 Neb. 671, 707-08, 463 N.W.2d 591, 614 (1990).

The Nebraska Supreme Court explained that such a standard of review is supported by statute and that

> [s]uch position is also supported by logic. We have held in appeals from the Public Service Commission, where review is also directly to this court, that we would not second-guess the commission or make independent findings or determinations of matters which are peculiarly within its expertise and involve a breadth of judgment and policy determination that will not be disturbed on appeal absent a showing of illegality, arbitrariness, capriciousness, or unreasonableness. [Citation omitted.]
>
> When consideration is given to the fact that our statutes require that members of the Public Service Commission need only be citizens and voters of the state, [citation omitted], whereas the director of the Department of Water Resources, who, together with the state hydrologist, conducted this hearing, is required to be a professional engineer with at least 5 years' experience in a position of responsibility in irrigation work, [citation omitted], there would seem to be little doubt but that similar deference should be afforded his expertise involving "judgment and policy determination."

*In re Application A-15738*, 226 Neb. at 152-53, 410 N.W.2d at 106.

## IV. ANALYSIS

We first note that in a 1987 appeal from an order entered by the Director, the Nebraska Supreme Court said, "The magnitude of the record in this case points out the difficult and almost impossible task that our own rules have imposed upon this court." *In re Application A-15738*, 226 Neb. at 148, 410 N.W.2d at 103. In addition, we further comment, by closely paraphrasing the subsequent discussion in the above-mentioned opinion, that the applications in this case were filed with the Department on July 25, 1990, which resulted in 20 days of hearings culminating with a 20-page order entered by the Director on July 2, 1992. The direct testimony constitutes

approximately 4,270 pages of the bill of exceptions. In addition, there are approximately 117 technical exhibits in this case, ranging from single-page printouts and maps to reports and books exceeding 400 pages in length. "The foregoing statement is only relevant to point up to us the possible need of altering our appellate practice to require the filing of a manageable statement of the case in lieu of a complete record of this magnitude." *Id.*

### 1. AVAILABILITY OF UNAPPROPRIATED WATER

The first assignment of error asserts in substance that the Director erred in finding that there was sufficient unappropriated water available to meet the applications.

In *In re Application A-15738*, 226 Neb. at 154, 410 N.W.2d at 107, the Nebraska Supreme Court stated that " 'unappropriated water' is that water which is available for appropriation because it is not subject to an existing appropriation right." See, also, *In re Application A-16642, supra.*

Wyoming argues that in determining that unappropriated water was available for the applications, the Director failed to utilize the proper method for measuring the availability of unappropriated water, failed to account for ground water depletions, misapplied the above definition of unappropriated water, and exceeded his authority concerning the priority of a pending senior water right.

Wyoming argues that the Director ignored existing appropriations in determining that water was available for the requested instream flows. Wyoming maintains that it was error for the Director to base his determination of water availability on historical flows and argues that the Director should have used data which reflected the full use of existing water rights.

The objectors' complaint in this regard is a factual question, i.e., was this factual conclusion by the Director that there existed unappropriated waters based on a relevant methodology. Since this is a question of fact, our review is limited to whether the Director's determination is supported by relevant evidence and is not arbitrary, capricious, or unreasonable. See *In re Applications T-61 and T-62*, 232 Neb.

316, 440 N.W.2d 466 (1989).

Central Platte NRD maintains that based on Wyoming's contention, an applicant would be "required to speculate as to the flows which would be in the Platte River if all senior appropriators were taking the full amount of water allowed under their permits instead of basing its water availability analysis on the water actually diverted under the existing appropriations." Brief for Central Platte NRD at 9-10. Central Platte NRD concedes that experts are allowed to make assumptions of fact, but argues that those assumptions must have some basis in fact and that in this case Wyoming's argument violates that rule by assuming facts that are contrary to those which are known. Central Platte NRD maintains that the historical data covering over 30 years necessarily includes the effects that ground water depletions, precipitation or lack thereof, actual use of water by holders of prior appropriations, and releases from storage facilities have had on the Platte River flows. Central Platte NRD also contends that Wyoming's argument that historical flows are not the way to measure availability of unappropriated water requires an assumption that past actions of hundreds of permit holders will uniformly change.

Two hydrologists provided the primary evidence concerning availability of flows. Duane Woodward appeared for Central Platte NRD, and Dr. David Frick appeared for Wyoming. Woodward obtained the daily average flow for each gaging station for each day of each year in the period of 1951 through 1980. He then determined, on a daily basis, how frequently a given flow would pass a given gaging station. The four stations used were Overton, Odessa, Grand Island, and Duncan. Both Woodward and Dr. Frick agreed that the recorded flows at the gaging stations reflected the consequences of diversions by appropriators from the river.

Dr. Frick stated that the historic flow data should be adjusted downward to reflect the potential full use of existing irrigation rights. No determination was made by Dr. Frick as to what this downward adjustment would be, nor was there any testimony by him showing how such difference between existing rights and historical use would significantly affect the availability of

unappropriated water. Citing the lack of necessary information in the record to make the adjustment and the principles of prior appropriation which have been used in this state for the past 100 years, the Director determined that the record contained no basis upon which to conclude that historic irrigation diversions did not properly fulfill demands. The Director concluded that the historic records fairly reflected current and reasonably expected river flows.

In its brief, Wyoming quotes the following from *In re Application A-16642*, 236 Neb. 671, 694, 463 N.W.2d 591, 607 (1990): "We should stress that we are not deciding whether the statute requires a finding that the availability of water for the instream appropriation will not be adversely affected by subsequent events; such a decision must await a case where the issue is determinative of the propriety of an appropriation." Wyoming says this is that case. We also look to *In re Application A-16642* for our response.

The complaining objectors further argue that the director committed error by failing to consider whether potential future uses of ground water or possible changes in climatic circumstances may diminish the amount of water available to the instream use in the future. They urge us to interpret § 46-2,115(1) as requiring consideration of these factors. In all their discussion of this issue, the only basis the complaining objectors offer to demonstrate that the director failed to consider these factors is the fact that the director found that there is unappropriated water available, despite the testimony of their witnesses. Although the complaining objectors attempt to frame this as a question of law, it is in truth a factual question. Thus, our review is limited to whether the director's determination is supported by competent and relevant evidence and is not arbitrary, capricious, or unreasonable.

*In re Application A-16642*, 236 Neb. at 693, 463 N.W.2d at 606.

The water availability evidence before the Director established the actual flow in the Platte River from 1951 (the beginning of recordation of such information) until 1990 (various exhibits supplemented Woodward's tables discussed above). Woodward testified that data for this period of time

would be considered by hydrologists to be a complete data set or representative data set. According to Woodward, this data represents the flow in the Platte River and reflects influences created by precipitation events, consumptive-use irrigation development, droughts, and other hydrologic occurrences in the Platte River region.

Wyoming argues that the Director should have considered ground water depletions in determining water availability. A hydrogeologist testified for Wyoming on the interrelationship between ground water and surface water. He concluded from his review of studies that due to present and future predictable ground water development along the Central Platte River and recharge of the ground water aquifer, the flows in the river will suffer additional depletions of 100 to 200 cfs.

To the extent that there have been depletions of the Platte River flow due to ground water reductions caused by irrigation development, such depletions are reflected in the historical data relied upon by the Director.

The Director stated in his order:

> Given available water supplies and accepting as fact past distribution of water was allowed according to the principles of prior appropriation (which have been the rule in Nebraska for nearly 100 years), the record contains no basis upon which to conclude that historic irrigation diversions did not properly fulfill demands. Therefore, it may be concluded that the historic records fairly reflect current and reasonably expected river flows, and, to Woodward's and Frick's original claims, adjustments are deemed unnecessary.

Determining the weight that should be given to expert testimony is uniquely the province of the fact finder. *In re Application A-16642, supra.*

The Director developed his own chart of the Platte River's "flow regime," based upon charts of water gage data, and determined the percentage of time particular flows that equaled or exceeded the requests in the applications passed the four gaging stations. The chart is included on the following page to assist the reader.

| Application/ Flow Request | Time Period | MEASURING STATION | | | |
| --- | --- | --- | --- | --- | --- |
| | | Overton | Odessa | Grand Island | Duncan |
| **A-17004** | | | | | |
| 500 cfs | Jan. 1 – June 23 | 91% | 88% | 90% | 92% |
| 600 cfs | June 24 – Aug. 22 | 29% | 24% | 29% | 29% |
| 500 cfs | Aug. 23 – Dec. 31 | 85% | 75% | 71% | 66% |
| **A-17006** | | | | | |
| 1,100 cfs | Dec. 10 - Feb. 25 | 77% | – | – | – |
| **A-17007** | | | | | |
| 1,100 cfs | Feb. 15 – Feb. 28 | 86% | 83% | 80% | – |
| 1,100 cfs | Mar. 1 – Mar. 31 | 87% | 85% | 87% | – |
| 1,100 cfs | Oct. 1 – Oct. 11 | 37% | 29% | 25% | – |
| **A-17008** | | | | | |
| 1,300 cfs | Apr. 1 – Apr. 14 | 67% | 60% | 75% | – |
| 1,500 cfs | Apr. 15 – May 3 | 39% | 34% | 49% | – |
| | Oct. 12 – Nov. 10 | 24% | 22% | 22% | – |
| **A-17009** | | | | | |
| 1,100 cfs | Apr. 1 – Apr. 14 | – | – | 84% | – |

Evidence established that flows of the Platte River are highly variable and that the species identified in the applications had adapted to this variable flow regime. The Director concluded that in light of the foregoing, "whether requested flows pass a particular measuring station during much or very little of the time is not determinative." Determining that conventional methods and standards of assessment appropriate to proposals for irrigation projects, for example, are inappropriate in this case, the Director stated that "[b]arring dramatic and lasting flow reductions," the bird species would continue to use and depend upon the habitat and food sources in the Platte River valley. The Director stated that the "fairly continuous and dependable" standard established in *In re Application A-15738* had to be considered within the context of the particular applications. He then determined that, except for the dismissed application, five of the applications met the standard.

In *In re Application A-15738*, 226 Neb. 146, 156, 410 N.W.2d

101, 107-08 (1987), a case concerning a *transbasin diversion* application for an irrigation project, the Nebraska Supreme Court quoted the Director's statements that " '[t]he existence of a dependable water supply is essential to the success of any irrigation project' " and that " '[a]s an average, less than one-fourth Appellants' maximum demand would have been available at their proposed diversion point.' " The court then stated that for unappropriated water to be available in a practical sense, the supply of water must be fairly continuous and dependable. In addition, the economic feasibility of an irrigation project is to be considered. In contrast, in an appropriation such as those requested in the case before us, there is not the necessity for great financial expenditure.

Central Platte NRD claims that Wyoming is disregarding principles that underlie Nebraska's prior appropriation system. One principle is that all water will be used for beneficial uses and only that much which is actually needed for such beneficial uses shall be applied. See, *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990); Neb. Rev. Stat. § 46-231 (Reissue 1988). The second principle is that in times of shortages, those with senior rights will be given their full allotted use of the water before any junior or subordinate right holders are allowed to take water from the particular source of supply. See *In re Application A-16642, supra.*

The Director considered potential adjustments for the Landmark Project and the Prairie Bend II Project, pending applications for other diversions that would be senior to applications A-17004 through A-17009. The Director stated that all pending applications for the Landmark Project had recently been turned down, although the denial had been appealed. (It has since been affirmed. See *In re Applications A-16027 et al.*, 242 Neb. 315, 495 N.W.2d 23 (1993).) Prairie Bend II is Central Platte NRD's own project, and its appropriations, if granted, would be senior in priority. The filing date of Prairie Bend II's applications is March 20, 1990. The Director noted in his order that "[Ron] Bishop [manager of Central Platte NRD] stated that Central Platte would intentionally operate Prairie Bend in such a manner as to first honor its own instream flow permits."

Wyoming contends that the Director could not base his determination that "there are no pending senior applications that would in fact or in effect further deplete existing flows" on Bishop's testimony. Wyoming argues that Bishop's representations are not supported by any formal action of Central Platte NRD and that it is beyond the scope of the Director's authority to ignore the priority of existing and pending water rights. Wyoming maintains that Central Platte NRD lacks the power to operate Prairie Bend II as junior in priority to these instream flows by stating that it will and that the Director lacks the power to subordinate the water rights of Prairie Bend II in this manner.

Because the filing date of the Prairie Bend II applications preceded the filing date of the instream flow applications, the Director was required under § 46-2,115 to give consideration to the Prairie Bend II applications. The Director determined to make no adjustment for this project because it would be operated in such manner as to honor the instream flow permits.

While Wyoming characterizes the Director's conclusion regarding Prairie Bend II as assigning a junior priority to those applications, such is not the case, as evidenced by the language of the Director's order that "[n]o adjustments of the historical records to account for pending projects are required." Wyoming complains that this determination made by the Director is erroneous because, in explanation, the Director paraphrased testimony from Bishop that Central Platte NRD would operate its Prairie Bend II project in such a manner that there would be sufficient flow to allow the operation of the instream flow project. Wyoming's principal contention is that the Director came to his conclusion based on an oral promise of Bishop that Prairie Bend II would pass flows sufficient to supply the flows requested in the instream flow applications. Contending that Bishop did not have the authority to bind Central Platte NRD regarding the Prairie Bend II project, Wyoming argues that such a commitment would require a resolution of Central Platte NRD's board of directors or an amendment of the Prairie Bend II applications to state such. We need not answer the question as to whether Bishop could orally bind Central Platte NRD to such a commmitment, nor need we

answer the question based on some notion regarding the fact that Central Platte NRD is the applicant in both the Prairie Bend II project and these instream applications. The reason for not answering these two questions is that the record before us reveals that there is sufficient relevant evidence upon which the Director could, and did, rely in coming to the conclusion that no adjustment in the historic record is necessary and that Prairie Bend II will pass sufficient flows. An explanation is necessary at this point.

Bishop's testimony, together with exhibit 9, the Game and Parks Commission's biological opinion concerning the Prairie Bend I project, and exhibit 18, the Planning Report/Draft Environmental Statement for the Prairie Bend unit prepared by the U.S. Department of the Interior, establishes that to obtain approval of their applications projects for irrigation development such as Prairie Bend II must satisfy the requirements imposed upon the Director by Neb. Rev. Stat. § 37-435 (Cum. Supp. 1992) (an element of the Nongame and Endangered Species Conservation Act, or NESCA). Under NESCA, before the Department can take any action to approve an irrigation project, it must consult with the Game and Parks Commission. In that consultation process, the Game and Parks Commission can impose minimum instream flow requirements upon an application in order to obtain a "nonjeopardy" opinion. See Little Blue N.R.D. v. Lower Platte North N.R.D., 210 Neb. 862, 317 N.W.2d 726 (1982). Thus, if the project refrains from taking water from the Platte River until certain minimum flows are met, the project will not jeopardize nongame and endangered species, and the requirements of § 37-435 are met.

The argument by Wyoming fails to take into account the evidence in the record that the pending Prairie Bend II applications for appropriations from the Platte River will be required to pass certain minimum flows in order to satisfy the requirements imposed upon the Director under § 37-435. Therefore, regardless of whether there was a resolution of the Central Platte NRD board of directors expressly binding the district to pass minimum flows under its Prairie Bend II applications, the project will have to pass minimum flows to

satisfy the Game and Parks Commission.

Exhibit 9 was admitted into evidence for a limited purpose, i.e., to demonstrate that the Department consulted with the Game and Parks Commission, that the opinion was prepared by the commission pursuant to its statutory duty, and that the factual data was received and evaluated by the Department. The biological opinion contained therein was not admitted into evidence. Nevertheless, exhibit 9 establishes the rationale employed by the Game and Parks Commission in determining that a particular project will not cause jeopardy to nongame and endangered species; namely, if the project refrains from taking water from the Platte River until certain minimum flows are met, the project will not jeopardize nongame and endangered species and will satisfy the requirements of § 37-435.

Exhibit 18 contains a biological assessment of a flow regime used to assess the effects of the Prairie Bend project on threatened and endangered species, involving four of the five species affected by the applications in this case. The Prairie Bend project is a multipurpose water resource/ground water recharge project that would divert water directly from the Platte River near Kearney, Nebraska. Prairie Bend II is one part of the entire Prairie Bend project.

The charts contained in exhibit 18 indicate recommended minimum flow requirements for the Deer Creek and Two Forks projects. These recommendations either meet or exceed the flows requested in the present inflow applications. According to the biological assessment, if the Prairie Bend project would pass the flows described on page III-23, the project would not adversely affect threatened and endangered species. The passage of certain minimum flows for the protection of threatened and endangered species is a matter that is within the specialized knowledge and experience of the Director, who is the recipient of the biological opinions rendered by the Game and Parks Commission pursuant to § 37-435.

By virtue of the requirements imposed by § 37-435 and by virtue of the position of the Game and Parks Commission that minimum flows have to be passed by irrigation projects, the Director had sufficient evidence upon which to base his

conclusion that minimum flow requirements would be imposed on the Prairie Bend II project which would effectively negate any influence the project would have on water availability for the instream flow applications.

Under Neb. Rev. Stat. § 84-914(5) (Reissue 1987), the Director may utilize his experience, technical competence, and specialized knowledge in the evaluation of the evidence presented to him. In analyzing the evidence of Central Platte NRD, the Director determined that the existence of the pending Prairie Bend II applications did not require an adjustment of the historical record in the determination of whether there was available unappropriated water in the Platte River. The passage of certain minimum flows for the protection of threatened and endangered species is a matter that is within the specialized knowledge and experience of the Director. Sufficient relevant evidence exists in the record to support the Director's conclusion that Prairie Bend II will have to pass minimum flows in such amount that these instream applications will have sufficient water to accomplish their objectives.

The judgment of the Director regarding the availability of unappropriated water was supported by competent and relevant evidence.

## 2. SENIOR WATER RIGHTS

As stated above, one of the determinations required before an instream appropriation right may be granted is the finding of a showing that the appropriations will not interfere with any senior surface water rights. Wyoming focuses on the Director's comment that there was an absence of evidence in the record demonstrating that senior appropriators would be affected and argues that by relying on the absence of evidence, the Director shifted the burden of proof from the applicant onto the objectors.

Wyoming assigns as error "[t]he Director's determination that there is an absence of evidence in the record indicating senior water rights would be affected amounts to a showing that the Applicant failed in its evidentiary burden." The findings of fact and conclusions of the Director concerning the lack of any effect by the instream flow applications on senior water

appropriations were as follows:

> With each application Central Platte specifically stated that the application would have no effect on other senior appropriations. Officially recognized water appropriations and pending applications within Water Division 1-A [Platte River] are tabulated in Exhibit 54. If approved, A-17004 through A-17009 would be junior in priority to nearly all of the other appropriations in Division 1-A. That fact, plus the absence of evidence in the record indicating that senior appropriators would be affected, makes compelling the claim that granting the applications would not adversely impact other appropriations. In addition, § 46-2,119 makes it clear that instream flow appropriations are subject to the same "first in time, first in right" standards that are binding on all other water appropriators. Accordingly, it must be concluded that granting the applications would not affect senior water appropriations.

Wyoming argues that there is no evidence in the record to indicate whether senior appropriators would be affected by the granting of these applications. Wyoming contends that the only citation to the record in the Director's discussion of the effect of the proposed flows on senior water rights is a reference to exhibit 54, the "Forty-Eighth Biennial Report of the Department of Water Resources," and that references to exhibit 54 during the hearings have nothing to do with senior water rights. The test to be applied when reviewing decisions of the Director, as stated above, is whether the Director's decision is supported by evidence in the record that there would be no effect upon the holders of senior water rights. The Director specifically found that there was evidence in the record which identified the senior water rights.

The officially recognized water appropriations and pending applications within Water Division 1-A (Platte River) are contained in exhibit 54 in a multipage chart arranged in downstream order. The evidence showed the existence of, amounts of, and priority dates for senior appropriations. The Director considered this evidence in the context of the prior appropriation system, which is applicable to instream flow

cases pursuant to Neb. Rev. Stat. § 46-2,119 (Reissue 1988).

The prior appropriation system has been the law in Nebraska since 1877. The doctrine of prior appropriation is codified in chapter 46, article 2, of the Nebraska Revised Statutes, including Neb. Rev. Stat. §§ 46-203 and 46-205 (Reissue 1988). Section 46-2,119 requires the Department to administer instream appropriations obtained through the permit process in the same manner as prescribed by chapter 46, article 2, for other appropriations. Thus, the doctrine of prior appropriation is applicable to instream flow appropriations and requires the Director to evaluate those applications in the context of the prior appropriation doctrine.

The Director reasoned that since the instream flow applications "would be junior in priority to nearly all of the other appropriations" in the water division by virtue of the rule of prior appropriation, the granting of the applications would not affect senior water appropriations. See §§ 46-203 and 46-2,119. The Director's findings and conclusions regarding senior water rights are supported by sufficient relevant evidence.

### 3. PUBLIC INTEREST

In determining whether an application is in the public interest, Neb. Rev. Stat. § 46-2,116 (Cum. Supp. 1992) requires the Director to consider (1) the economic, social, and environmental value of the instream use or uses including, but not limited to, recreation, fish and wildlife, induced recharge for municipal water systems, and water quality maintenance and (2) the economic, social, and environmental value of reasonably foreseeable alternative out-of-stream uses of water that will be foregone or accorded junior status if the appropriation is granted. Wyoming contends that the foregone uses question goes unanswered in the Director's order.

Two economists testified regarding public interest: Dr. Raymond Supalla, for Central Platte NRD, and Gary Watts, for Wyoming. In addition, Dr. Supalla's report entitled "Analysis of Public Interest Factors for Proposed Platte River Instream Flows" dealt in depth with the economic, social, and environmental value of foregone uses. Wyoming asserts that,

pursuant to Neb. Rev. Stat. § 46-289 (Reissue 1988), the Director's order must document his decision by reference to the hearing record and that because it did not, his order is inadequate and arbitrary. Unlike § 46-289, which refers to an application for an interbasin transfer of water, § 46-2,116 has no requirement that the Director document his decision to the hearing record in determining whether an application for an instream appropriation is in the public interest.

### 4. Dr. Bleed

Dr. Ann Bleed is the state hydrologist. She is employed by the Department, and she served as an examining officer at the hearings on Central Platte NRD's applications.

### (a) Disqualification of Dr. Bleed

Wyoming asserts as error that the Director refused to issue a subpoena to compel the attendance of Dr. Bleed at the hearings as a witness. Wyoming wished to adduce testimony from her regarding exhibit 113, which has been referred to as the "Bleed study." In fact, Dr. Bleed was one of four coauthors of the study. Dr. Supalla testified that exhibit 113 was prepared under his direction and control. It seems that it would be more appropriate to call this the "Supalla study," if we were going to attach names to it.

The purpose and objective of exhibit 113 was to develop planning procedures which would facilitate public decisions concerning various future water development plans. The research sought to develop low-cost procedures for reconnaissance level analyses of alternative project configurations, to analyze the economic and environmental tradeoffs associated with alternative uses of the Platte River, and to identify and evaluate alternative methods for financing water development plans.

Regarding instream flow questions, exhibit 113 mentions these flows in the context of preservation of environmental quality as part of irrigation project planning processes. The report goes on to state: "Because of the legal importance of the Nebraska Game and Parks official opinion (NGPC, 1983) on instream flow requirements for endangered and threatened species, an attempt was made to include the requirements of

this opinion as an objective in the optimization model." For purposes of analysis, 15 sets of monthly instream flow constraints were defined, and the optimization model was then run for all 15 instream flow constraints to establish the level of tradeoffs between economic returns and environmental quality.

Evidently, since exhibit 113 deals with instream flows as part of the proposed model and since Dr. Bleed was a coauthor, Wyoming questions her integrity and honesty as an examining officer.

Wyoming filed its request for a subpoena for Dr. Bleed 10 days into the hearings. Dr. Bleed had participated throughout this time period as the State's examining officer.

The record reflects that the hearing officer, when confronted with the praecipe for the subpoena of Dr. Bleed, consulted with the Director. On page 2,361 of the bill of exceptions, we find the following:

> I presented it [the praecipe] to the Director late yesterday afternoon. He indicated to me that because Ms. Bleed, being the subject of that [praecipe] for subpoena, is acting as the examining officer and will be assisting him in the decision-making process, it would be inappropriate for her to participate as a witness, and as such, he would not issue the subpoena.

Upon Central Platte NRD's request, the Nebraska rules of evidence were applicable to this proceeding. Under Neb. Evid. R. 605, Neb. Rev. Stat. § 27-605 (Reissue 1989), the judge presiding at a trial may not be called as a witness at that trial. The function of Dr. Bleed appears to be that of an agent of the Director. As stated in the record, she "is acting as the examining officer and will be assisting him [the Director] in the decision-making process." The parties had agreed that the rules of evidence would apply, and given the unique structure of the water hearings, Dr. Bleed was functioning as the alter ego of the Director. The request for a subpoena, pursuant to rule 605, was properly rejected.

### (b) Bias of Dr. Bleed

Wyoming also maintains that since Dr. Bleed coauthored exhibit 113, she should have been disqualified as not being

impartial, particularly since she was functioning as the State's examining officer and would be the technical advisor to the Director.

The Nebraska Supreme Court has adopted the rule that those serving as adjudicators in administrative proceedings serve with the presumption of honesty and integrity. *Buhrmann v. Sellentin*, 218 Neb. 288, 352 N.W.2d 907 (1984). Wyoming asserts that it has rebutted this presumption by introducing exhibit 113 into evidence, which exhibit was coauthored by Dr. Bleed.

The focus of the authors of exhibit 113 was to develop a model to provide a basis of analysis for the Platte River irrigation project optimizing economic, environmental, and financing alternatives. The authors of exhibit 113 did not express or adopt any opinion that instream flows are needed or necessary in any particular situation in any particular reach of the Platte River. Rather, the authors take as a given that environmental concerns connected with the use of the Platte River exist and determine that those concerns need to be represented in their analysis.

Wyoming fails to prove that Dr. Bleed has formed an opinion that relates directly to the merits of Central Platte NRD's applications. The use of instream flows for certain fish and wildlife is discussed in exhibit 113. However, the authors do not make any effort to evaluate the need for the flows of the species. It is stated at pages 43-44 of Central Platte NRD's brief that

> [m]uch like a judge who has heard cases involving similar questions of law and fact but does not lose the presumption of honesty, integrity, and the lack of bias, Dr. Bleed who has had some exposure to the concept of instream flows does not lose her presumption of honesty, integrity, and the lack of bias.

There has been no showing that Dr. Bleed had drawn conclusions regarding instream flows.

While Wyoming may argue that since it was unable to call Dr. Bleed as a witness, it was unable to cross-examine her regarding exhibit 113, this argument disregards the evidence that Dr. Supalla was the manager of the project that culminated in the

publication of exhibit 113. Wyoming did not question Dr. Supalla concerning the report and Dr. Bleed's involvement or whether Dr. Bleed adopted any of the opinions concerning environmental flows as her own. The lack of a subpoena for Dr. Bleed did not preclude Wyoming from adducing other writings or information that could establish Dr. Bleed was biased. Further, the lack of a subpoena for Dr. Bleed did not preclude Wyoming from adducing the testimony of others regarding exhibit 113 or calling in other experts to learn whether they had evidence which could establish bias on the part of Dr. Bleed as relates to exhibit 113. We conclude that Dr. Bleed was not biased or prejudiced and that, therefore, she was correctly not disqualified.

## V. CROSS-APPEAL

Central Nebraska Public Power and Irrigation District (CNPPID) cross-appeals the Director's order of July 2, 1992, as to applications A-17004 and A-17008. CNPPID alleges in its assignment of error that the Director's finding that the rate and timing of the flows are the minimum necessary to maintain the uses identified in the two applications is not supported by competent and relevant evidence. CNPPID argues that the intent of application A-17004 is to maintain sufficient habitat for forage fish and macroinvertebrates that serve as food sources for least terns and piping plovers, but that there is no evidence in the record to establish that least terns or piping plovers are presently adversely affected by a lack of food. CNPPID maintains that the Director did not find that a causal link exists between the maintenance of a minimum flow as requested in application A-17004 and the provision of a necessary food source for least terns and piping plovers.

Section 46-2,115(4) requires that the rate and timing of the flow be "the minimum necessary to maintain the instream use or uses for which the appropriation has been requested." The issue is not what the term "minimum necessary" means, "but, rather, what is the nature of the use for which the appropriation is requested." *In re Application A-16642*, 236 Neb. 671, 699, 463 N.W.2d 591, 610 (1990). Here, the use is to provide for adequate habitat for fish and macroinvertebrates which are

food sources for the least tern and the piping plover.

The flow requested in application A-17004 was 500 cfs for the periods January 1 to June 23 and August 23 to December 31, with a rate of 600 cfs requested for the period June 24 to August 22. The Director noted that fish require water in order to survive. Evidence showed that the requested rate up to a rate of 800 cfs is desirable in the warmer months to increase water depth to that which the fish prefer and to reduce increased water temperatures to attempt to avoid fishkill.

The Director found that there was evidence to show that the rate and timing of the flows were the minimum necessary to maintain habitat for forage fish and for macroinvertebrates. The rate of flow which is the minimum necessary for the use is the lowest rate which would ensure that there would not be a loss in the habitat needed by the forage fish. Central Platte NRD presented evidence that related the amount of habitat suitable for forage fish to the amount of flow. With the sand shiner as an example, the data showed that the amount of suitable habitat declined with flows lower than 750 cfs. CNPPID's witness James Chadwick acknowledged that if the flows never exceeded the level he advocated, 300 cfs, present fish populations would not be maintained.

The Director stated: "Contrary to the urgings of some, the minimum amount of flow is not necessarily the least amount indispensably required for continued survival. Instead, each application must be examined to determine if the flow rates requested are the least amount necessary to fulfill their intended purposes." The intent of the application is to maintain sufficient habitat for fish, relied upon by least terns as a food source, and macroinvertebrates, used as food by piping plovers. Determining the minimum necessary flow for the maintenance of the use requested is a factual determination which will not be disturbed on appeal unless it is unsupported by the evidence or is arbitrary, capricious, or unreasonable. See *In re Application A-16642, supra.* The evidence demonstrates a causal link between the requested flows and the use requested. The Director's finding in this regard is supported by sufficient evidence.

CNPPID also argues that the use of the Platte River by

whooping cranes is limited and that the Director found no causal link between the maintenance of flow requested in application A-17008 and the needs of the whooping cranes. CNPPID contends that whooping cranes use small bodies of water to roost and that no whooping crane "staging," the behavior typical of sandhill cranes, occurs on the Platte River.

Central Platte NRD argues that the stated purpose of application A-17008 is to "maintain adequate staging and roosting habitat for migrating sandhill cranes while at the same time providing *stopover habitat for whooping cranes* on their annual migrations." Reply brief for Central Platte NRD at 10. The evidence showed that flows of 1,700 to 2,500 cfs maintain maximum habitat and that as flows drop below 1,500 cfs, habitat for whooping cranes drops markedly. Expert testimony differed as to adequate flow rates, but the Director stated that he found testimony which undermined recommended flows of 1,000 cfs. The finding of the Director of flow rates of 1,300 and 1,500 cfs for application A-17008 is supported by the evidence.

## VI. CONCLUSION

Finding no errors appearing in the record, we affirm the order of the Department of Water Resources regarding applications A-17004 through A-17009.

AFFIRMED.