CENTRAL PLATTE NATURAL RESOURCES DISTRICT, APPELLEE AND CROSS-APPELLEE, V. STATE OF WYOMING, APPELLANT, CENTRAL NEBRASKA PUBLIC POWER AND IRRIGATION DISTRICT, APPELLEE AND CROSS-APPELLANT, AND LOWER PLATTE NORTH NATURAL RESOURCES DISTRICT ET AL., APPELLEES, APPLICATIONS A-17004, A-17005, A-17006, A-17007, A-17008, AND A-17009, OF THE CENTRAL PLATTE NATURAL RESOURCES DISTRICT.

513 N.W.2d 847

Filed March 25, 1994.    No. S-92-664.

440

Dennis C. Cook, Senior Assistant Wyoming Attorney General, and Donald M. Gerstein; Lawrence J. Wolfe, of Holland & Hart; and James W. Hewitt for appellant.

James E. Doyle IV, of Cook, Wightman & Doyle, for appellee Central Platte Natural Resources District.

Michael C. Klein, of Anderson, Klein, Peterson & Swan, for appellee Central Nebraska Public Power and Irrigation District.

George E. Svoboda and Bradley E. Nick, of Sidner, Svoboda, Schilke, Thomsen, Holtorf & Boggy, for appellee Lower Platte North Natural Resources District.

Glen A. Murray for appellees National Audubon Society and Nebraska Chapter of the Sierra Club.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, FAHRNBRUCH, and LANPHIER, JJ., and GRANT, J., Retired.

WHITE, J.

The Central Platte Natural Resources District (CPNRD) applied for instream flow appropriations in the Platte River. The director of the Department of Water Resources (director) granted portions of the applications. The State of Wyoming (Wyoming), which had objected to the applications, appealed to the Nebraska Court of Appeals. The Court of Appeals affirmed. Wyoming then petitioned for and was granted further review in this court. We affirm in part and in part reverse. The cause is remanded for further proceedings.

## I. BACKGROUND

On July 25, 1990, CPNRD filed six applications for permits to appropriate water for instream flows in the Platte River. CPNRD essentially sought to reserve water rights in order to maintain food sources and habitats for five bird species. The details of these applications are set forth in the Court of Appeals opinion, *In re Applications A-17004 et al.*, 1 Neb. App. 974, 512 N.W.2d 392 (1993). Wyoming objected to the applications. Wyoming owns land bordering the Platte River in Buffalo and Kearney Counties in Nebraska and intends to use that land as a whooping crane migrational habitat.

During July and September 1991, the Department of Water Resources held hearings on CPNRD's application. On July 2, 1992, the director granted three of the applications, granted in part and denied in part one of the applications, denied one application, and dismissed one application. Wyoming appealed from this decision. The appeal concerns only those applications and parts of applications which the director granted. Additional facts will be supplied in conjunction with the specific assignments of error.

Wyoming asserts eight assignments of error. These assignments of error fall roughly into two groups. First,

Wyoming asserts that the Court of Appeals improperly interpreted and applied three subsections of Neb. Rev. Stat. § 46-2,115 (Reissue 1988): subsection (1), concerning the availability of unappropriated water; subsection (3), concerning the interference with senior water rights; and subsection (5), concerning the public interest. Second, Wyoming asserts that the Court of Appeals erred in finding that the participation of Dr. Ann Bleed, a state hydrologist, did not violate due process.

The standard of review in appeals from the Department of Water Resources is well established. Regarding factual determinations, an appellate court's review is limited to deciding whether the agency's determination is supported by competent and relevant evidence and is not arbitrary, capricious, or unreasonable. *In re Applications A-16027 et al.*, 242 Neb. 315, 495 N.W.2d 23 (1993) (*Blue River*), *modified on other grounds* 243 Neb. 419, 499 N.W.2d 548; *In re Application A-16642*, 236 Neb. 671, 463 N.W.2d 591 (1990) (*Long Pine Creek*); *In re Application A-15738*, 226 Neb. 146, 410 N.W.2d 101 (1987) (*Enders Reservoir*). The meaning of a statute, however, is a question of law, and a reviewing court is obligated to reach its conclusions independent of the determination made by the administrative agency. *Long Pine Creek, supra.*

## II. ANALYSIS

### 1. § 46-2,115

Nebraska has enacted a statutory scheme which permits instream flow appropriations. See Neb. Rev. Stat. §§ 46-2,107 through 46-2,119 (Reissue 1988 & Cum. Supp. 1992). We have held that this statutory scheme is constitutional. See *Long Pine Creek, supra*.

Under the statutory scheme, the director shall approve applications for instream flows only if the director finds that (1) there is unappropriated water available to provide for the instream appropriation; (2) the appropriation is necessary to maintain the instream use or uses for which the appropriation has been requested; (3) the appropriation will not interfere with any senior surface water appropriation; (4) the rate and timing of the flow is the minimum necessary to maintain the instream

use or uses for which the appropriation has been requested; and (5) the application is in the public interest. § 46-2,115. The burden of proof is on the applicant to establish these elements. Neb. Rev. Stat. § 46-209 (Cum. Supp. 1992). At issue here are subsections (1), (3), and (5).

### (a) Availability of Unappropriated Water

Wyoming contends that the director improperly found, under § 46-2,115(1), that there was sufficient unappropriated water to grant the instream flow applications. Wyoming further contends that the Court of Appeals improperly reviewed the decision. Wyoming's contention regarding unappropriated water consists of four separate arguments.

### (i) Methodology

Wyoming first argues that the director used an improper methodology to determine water availability. Wyoming also argues that the Court of Appeals improperly reviewed the director's decision.

The testimony at the hearing established two possible methods of determining water availability.

CPNRD's witness, Duane Woodward, testified to the historic flow method. To arrive at the historic flow, Woodward obtained daily flow records from various gauging stations along the river. Using approximately 30 years of such measurements, Woodward determined how often a given flow occurs at a given station. For example, the historic flow data could establish that the flow at the Overton station will exceed 500 cubic feet per second (cfs) 91 percent of the time. The historic flow data can also be used to establish the mean and median flow levels, or incremental flow levels, at a given station. The historic flow data represents the amount of water actually flowing in the river; as such, it reflects the consequences of any actual upstream diversions by appropriators.

Wyoming's witness, David Frick, suggested a different method for determining water availability, which we will refer to as the full rights method. Frick testified that the historic flow data should be reduced by the existing appropriation rights. Frick would also estimate and account for any flow returning to

the river. The downward-adjusted number would thus represent the amount of water available if all appropriators simultaneously exercised the full extent of their appropriation rights.

In reaching his final decision, the director concluded that "the historic records fairly reflect current and reasonably expected river flows, and . . . adjustments are deemed unnecessary." It thus appears that the director followed the historic flow method.

The Court of Appeals found that the choice of methodology was a factual question—whether the director was using a relevant methodology—and that Woodward's testimony supported the director's methodology.

We find that the Court of Appeals erred in characterizing the methodology issue as a factual question; the methodology issue is a question of law. Certainly the methodology must be relevant, but it must also be in accord with law. We understand Wyoming's challenge to be that the historic flow method is relevant but not in accord with law. Addressing methodology as a question of law, we conclude that the director used a permissible method to determine the amount of unappropriated water.

To grant an instream flow application, by statute, the director must find that there is sufficient "unappropriated water available." § 46-2,115(1). For purposes of an instream flow application, this court has previously defined "unappropriated water" as " 'that water which is available for appropriation because it is not subject to an existing appropriation right.' " *Long Pine Creek*, 236 Neb. at 692, 463 N.W.2d at 606. Accord *Enders Reservoir, supra*. We must now decide what is meant by "subject to an existing appropriation right." Specifically, we must decide whether the director may use the historic flow method to determine the amount of water not subject to an existing appropriation right.

We have touched upon the methodology issue twice before, in *Enders Reservoir* and *Long Pine Creek*. Significantly, however, these two cases did not require us to approve either the historic flow method or the full rights method. Thus, these two cases do not provide us with a rule by which we can test the

director's methodology.

According to the Nebraska Constitution, the use of the water of every natural stream within the State of Nebraska is dedicated to the people of the state for beneficial purposes. Neb. Const. art. XV, § 5. All appropriations must be for some beneficial purpose. Neb. Rev. Stat. § 46-229 (Reissue 1988). The holder of an appropriation right is required to use the water only for beneficial purposes. *Enders Reservoir, supra*; *Frenchman Valley Irr. Dist. v. Smith*, 167 Neb. 78, 91 N.W.2d 415 (1958). This is known as the beneficial use requirement. See, *Enders Reservoir, supra*; *Hostetler v. State*, 203 Neb. 776, 280 N.W.2d 75 (1979).

The beneficial use requirement limits the amount of water which the holder can actually appropriate. For example, if a landowner had an appropriation right to use 10 cfs for irrigation purposes, and if the landowner needed only 5 cfs in a given month, then the landowner would not be entitled to capture and sell the other 5 cfs. Cf. *Hostetler, supra*. An appropriation right extends only as far as the beneficial use requirement will allow. A. Dan Tarlock, Law of Water Rights and Resources § 5.05[2] (1993).

It thus appears that an appropriation right can be measured in two ways. First, the right can be measured with reference to the appropriation limit. This is a fixed and theoretical limit—the most water that a particular holder is authorized to use. Second, the right can be measured with reference to the beneficial use limit. This is a fluctuating and practical limit—the amount of water that a particular holder is entitled to use at any given time.

We find that the phrase "subject to an existing appropriation right" refers to the appropriation right measured by the beneficial use limit. That is, when the director considers an instream flow application, the director must find that there is enough water that is not subject to another appropriator's beneficial use. The question then becomes how the director is to measure the water that is not subject to another appropriator's beneficial use.

We find that the historic flow method is a permissible way of measuring the beneficial use limit. As explained above, the

beneficial use limit fluctuates with the appropriators' needs. The appropriators' needs fluctuate with external factors. The most important external factor is the weather; in a dry year, the holders' need to divert water for irrigation increases dramatically. The historic flow method lends perspective to the fluctuations because the data is collected over a span of years. According to Woodward, the historic flow data used in his calculations encompassed almost 30 years and included periods of high precipitation and periods of drought. In short, the amount of water that is actually in the river is a rough approximation of the amount of water not needed for beneficial use elsewhere. Accord *Temescal Water Co. v. Dept. Public Works*, 44 Cal. 2d 90, 280 P.2d 1 (1955) (stating that the amount of unappropriated water will depend on the stream's flow, the rainfall, and the nonuse of existing rights).

We hold that the director used a permissible methodology, the historic flow method, to determine that there was sufficient unappropriated water available. We stress that our holding is limited to applications for instream flows.

### (ii) Senior Applications

Wyoming next argues that the director erred by failing to account for pending senior applications. Wyoming also argues that in reviewing this issue, the Court of Appeals erred by relying on evidence submitted for a limited purpose.

In determining the amount of unappropriated water available, the director must account for water which may be diverted by two types of senior appropriators whose rights are not reflected in the historic flow records: pending senior applications and approved-but-unconstructed senior applications. The director considered two such senior applications relevant to CPNRD's instream flow applications: the Landmark Project and the Prairie Bend Project.

The director denied the application for the Landmark Project, and this court affirmed that decision. See *Blue River, supra*. Therefore, the Landmark Project does not necessitate any adjustments to the historic flow records. The Prairie Bend Project is more problematic.

Prairie Bend is CPNRD's own project. Prairie Bend

involves, in part, a diversion of water from the Platte River near Kearney, Nebraska. Ron Bishop, manager of CPNRD, testified that although the Prairie Bend Project would be senior in priority to CPNRD's instream flow appropriations, CPNRD would operate Prairie Bend in such a manner as to first honor its own instream flow permits. Relying on Bishop's testimony, the director found that the Prairie Bend Project did not necessitate any adjustments to the historic flow records.

We find that the record does not support the director's conclusion that Prairie Bend will divert water as if it were junior to, not senior to, the instream flows.

The director's reliance on Bishop's sworn testimony is misplaced. In essence, Bishop purported to waive Prairie Bend's appropriation right to the extent necessary to satisfy the requirements of the instream flow application. There is no evidence to establish that Bishop has the power to bind CPNRD to such a waiver. If Bishop has no power to bind CPNRD, then his testimony cannot be relied on as substantive proof that the Prairie Bend Project will not reduce the existing flows. We therefore find that the evidence cited by the director does not support his conclusion.

The Court of Appeals affirmed the director's decision on a different basis. The court linked together three items: Neb. Rev. Stat. § 37-435 (Cum. Supp. 1992), a Game and Parks Commission opinion, and a biological assessment. We find that the evidence cited by the Court of Appeals does not support the director's conclusion.

Under § 37-435, before authorizing a diversion project, the Department of Water Resources must consult with the Game and Parks Commission. See *Little Blue N.R.D. v. Lower Platte North N.R.D.*, 210 Neb. 862, 317 N.W.2d 726 (1982) (*Little Blue II*), overruled on other grounds, *Blue River, supra*. The department must obtain from the Game and Parks Commission a "nonjeopardy opinion"—an opinion that the project will not jeopardize threatened or endangered species. See *Little Blue II, supra*.

In *Little Blue II*, this court discussed the relative power of the Game and Parks Commission, the Department of Water Resources, and the applicant. We held that although the

nonjeopardy opinion does not give the Game and Parks Commission absolute veto power, neither the department nor the applicant can ignore the conclusion of the Game and Parks Commission, "if in fact the evidence supports that conclusion." *Little Blue II*, 210 Neb. at 873, 317 N.W.2d at 733.

Citing *Little Blue II*, the Court of Appeals stated that "the Game and Parks Commission can impose minimum instream flow requirements upon an application." *In re Applications A-17004 et al.*, 1 Neb. App. 974, 990, 512 N.W.2d 392, 402 (1993). While this may be true in a practical sense, it is not true in a legal sense. For example, the director is not required to accept the conclusion of the Game and Parks Commission if the evidence does not support that conclusion. See *Little Blue II, supra*. The opinion of the Game and Parks Commission does not, merely by being issued, impose affirmative requirements upon an application.

There is simply no evidence in the record that the Prairie Bend Project is legally obligated to pass the minimum flows required by the instream flow applications. Although the biological assessment cited by the Court of Appeals is some evidence of Prairie Bend's intent to pass certain flows, it is not legally binding. Parenthetically, we also note that not all the flows suggested by the biological assessment meet or exceed the requirements of the instream flow applications.

Without firm evidence that Prairie Bend will pass the minimum flows required by the instream flow applications, the possibility exists that the operation of Prairie Bend will reduce the amount of water available for the instream flow applications. Thus, the director was not at liberty to assume that Prairie Bend would have no effect on water availability. The record does not support the director's conclusion that "there are no pending senior applications that would in fact or in effect further deplete existing flows." The applications must be remanded so that the director can consider how the Prairie Bend Project will affect water availability.

In the interest of judicial economy, we will consider Wyoming's additional assignments of error.

### (iii) Ground Water Depletion

Wyoming next argues that the director should have adjusted the historic flow amounts by subtracting future and current ground water depletion.

Ground water depletion, in this context, concerns wells which drain water from the aquifer. The aquifer, in turn, is recharged by the river. As a result of this depletion and recharging, the flows in the stream may be reduced.

At the hearing, Wyoming offered the testimony of Vern Hinckley, a hydrogeologist. Hinckley reviewed a number of studies regarding future ground water depletion. These studies were predicated on varying projections regarding the extent of future ground water development. Based on his review of the studies, Hinckley offered his opinion that future ground water depletions will reduce the flows in the Platte River by 100 to 200 cfs. However, on cross-examination, Hinckley admitted that he had not made any effort to compare the studies' projections with actual ground water development.

The director's opinion does not discuss ground water depletion. The Court of Appeals affirmed the director's decision, reasoning that the director, as fact finder, was entitled to determine the weight given to expert testimony. We find that the Court of Appeals reached the correct result for the wrong reason.

To put this argument into perspective, we reiterate that the central issue is the proper definition of unappropriated water. Relying on Hinckley's testimony, Wyoming suggests in essence that ground water withdrawn from wells which are recharged by the Platte constitutes appropriated water. We disagree.

We have faced this issue once before. In *Long Pine Creek*, the objectors raised the possibility of future ground water depletion. Based on the evidence then presented, we found that sufficient water existed in the creek to meet the application despite the possibility of increased ground water withdrawals. We reserved the question of "whether the statute requires a finding that the availability of water for the instream appropriation will not be adversely affected by subsequent events." *Long Pine Creek*, 236 Neb. at 694, 463 N.W.2d at 607.

We now answer the question reserved in *Long Pine Creek* by holding that the statute does not require the director to consider

future ground water depletion.

To the extent that ground water will be withdrawn in the future, this ground water remains, at the present, unappropriated water. In part II(1)(a)(i) of this opinion, we held that for purposes of an instream flow application, surface water which had not been diverted from the Platte River for a beneficial use constituted unappropriated water. It logically follows that ground water which has not been removed also constitutes unappropriated water. We therefore hold that the director was not obliged to reduce the historic flow records to account for future ground water depletions.

To the extent that ground water is currently being withdrawn and recharged by the Platte, the ground water depletion is accounted for by the historic flow records. Hinckley testified that ground water depletion is not always immediately reflected by the level of flow; the depletion and recharge occur over a period of time, which can be as long as 17 years. Other than these general statements, however, there is no specific evidence establishing any depletions for which the historic flow records have failed to account. There is no evidence, in other words, that the historic flow records are inaccurate with respect to current ground water depletion. The director therefore did not err in relying on the historic flow records to account for current ground water depletion.

We note that the relative rights of those using ground water and those using surface water are often unclear. The courts can begin to give outlines and shape to these rights, but only in a case-by-case, piecemeal fashion, and only when those rights are brought into direct conflict. Wyoming's evidence regarding ground water depletion does not establish a direct conflict, but, rather, an anticipated conflict. This anticipated conflict is best resolved by the policy-based decisionmaking process that is the province of our Legislature. In fact, the Legislature has recently created a system whereby public water suppliers—municipalities, water districts, irrigation districts, and the like—can apply for appropriation rights and thus secure their priority. See 1993 Neb. Laws, L.B. 301.

It is the Legislature, and not the courts, which can paint a water rights picture with broad strokes and bold colors. It is to

the Legislature that Wyoming must direct its argument regarding future ground water depletion.

### (iv) Continuity and Dependability

Wyoming next argues that the director misapplied the relevant legal standard regarding water availability. Wyoming also argues that the Court of Appeals erred in failing to correct this misapplication. The director's approach to water availability and Wyoming's argument regarding that approach cannot be understood without some discussion of the *Enders Reservoir* case, to which we now turn.

In *Enders Reservoir*, three irrigation districts applied for a transbasin diversion. The applicants proposed to divert water from the South Platte River basin to the Frenchman River, which flows into the Enders Reservoir and eventually into the Republican River. The director found that there was insufficient available water: " '[On] average, less than one-fourth [applicants'] maximum demand would have been available at their proposed diversion point.' . . . '[T]here is not a source of unappropriated water at [a]pplicants' proposed South Platte River diversion point sufficient to meet their demand.' " *Enders Reservoir*, 226 Neb. at 156, 410 N.W.2d at 107-08. Due in part to insufficient water availability, the director denied the application.

This court affirmed the director's decision. We recognized that to be "available," a water supply did not need to be perfectly reliable. "[T]o be available in a practical sense the supply of water must be fairly continuous and dependable." *Id.* at 156, 410 N.W.2d at 108. See *Wyoming v. Colorado*, 259 U.S. 419, 42 S. Ct. 552, 66 L. Ed. 999 (1922). Applying this standard to the transbasin diversion, we stated that water clearly "would not be present in such a quantity as to supply the [applicants'] desired amount on a fairly continuous and dependable basis." *Enders Reservoir*, 226 Neb. at 156, 410 N.W.2d at 108.

Immediately following this statement, the *Enders Reservoir* opinion contains an economic discussion focusing on the likely success of the applicants' proposed irrigation project. In this economic discussion, we considered a New Mexico case and a Texas case, both of which held that an application could be

denied if there was so little water that the project would be doomed to failure. We found that the director had the power to act in the public interest and to deny an application doomed to failure.

With regard to CPNRD's applications, the director merged *Enders Reservoir*'s water availability analysis with its economic analysis. On one hand, the director recognized that the actual flows were often less than the requested flows. The director noted that the flow regime was highly variable and that the species identified in the applications had adapted to the fluctuations. On the other hand, the director explained that the instream flow applications did not contemplate investment or construction and thus would not require revenues to offset expenses. The director judged "conventional methods" for assessing proposals "inappropriate" for CPNRD's applications. The director determined that the "fairly continuous and dependable" standard had to be considered in the context of the application at hand. The director concluded that CPNRD's applications met the standard.

The Court of Appeals did not reach any conclusion on this issue. The court set forth some of the director's findings and briefly discussed *Enders Reservoir*. The court then distinguished *Enders Reservoir* from CPNRD's application because the latter did not require "great financial expenditure." *In re Applications A-17004 et al.*, 1 Neb. App. 974, 988, 512 N.W.2d 392, 401 (1993).

Wyoming argues that the director has established two separate standards—one for irrigation projects and one for instream flow applications. Wyoming further argues that if the director can view the standard within the context of a particular application, then the director can arbitrarily set the standard and decide when the standard has been met.

We find that the director correctly considered the purpose of the requested flows. We further find that the record supports the director's determination that there was a fairly continuous and dependable flow.

A determination regarding water availability cannot and should not be divorced from the applicant's purpose. There are two ways in which the applicant's purpose affects the "fairly

continuous and dependable" standard.

First, the nature of a fairly continuous and dependable flow may change depending upon the nature of the application. An application to divert water is not the same as an application for instream flows; an irrigation project is not the same as a habitat project. If an irrigation project fails because insufficient water was available, then there is a loss on the investment and a loss to any junior downstream appropriators who could have used the diverted water. In contrast, if a habitat project fails, then there is minimal, if any, loss of investment, and there is no loss to junior downstream appropriators, because the water was never removed from the stream.

Second, in the context of instream flow applications, the threshold of a fairly dependable and continuous flow may change depending on the specific goals of the application. A wildlife project is not the same as a recreation project.

In the context of an instream flow application to maintain existing wildlife habitats, we hold that "fairly continuous and dependable" means the flow regime which the species can bear. Put another way, there is sufficient water available under § 46-2,115(1) when there is enough water to maintain the wildlife habitat sought by an applicant.

The purposes of CPNRD's applications were (1) to maintain habitats for fish and aquatic macroinvertebrates that serve as a food source for least tern and piping plovers, and (2) to maintain staging and roosting habitats for sandhill cranes and whooping cranes. Although the flows in the river are highly variable, the record reflects that the species identified in the applications have adapted to the variable flow regime. There is not so little water that the project is doomed to failure; to the contrary, the habitats are likely to succeed. We conclude that because the habitats sought by the current applications can survive under the existing flow regime, there is sufficient water available.

### (b) Interference with Senior Surface Water Rights

The director found, under § 46-2,115(3), that CPNRD's instream appropriations would not interfere with any senior surface water appropriation. Wyoming correctly notes that

CPNRD has the burden of establishing noninterference. See § 46-209. Wyoming contends that CPNRD failed to present evidence of noninterference and that therefore the director could not have found noninterference.

The Court of Appeals found that the director's decision was supported by two pieces of "evidence": exhibit 54, showing the senior appropriators and their respective priority dates, and a statutory declaration, see § 46-2,119, that instream appropriations are subject to the doctrine of prior appropriation.

With somewhat different reasoning, we find that the director's decision is supported by competent evidence.

Section 46-2,108 defines an instream appropriation as "the undiverted application of the waters of a natural stream within or bordering upon the state for recreation or fish and wildlife purposes." An instream appropriation contrasts with a stream diversion; the former leaves the water in the stream, while the latter takes water out of the stream. An instream appropriation essentially sets minimum flow levels which must be met before junior appropriators can begin to divert water from the stream.

Interference with senior water rights occurs when a junior appropriator's use deprives the senior appropriator of some part of his allotment. See *State, ex rel. Cary, v. Cochran,* 138 Neb. 163, 292 N.W.2d 239 (1940). Because an instream appropriation leaves the water in the stream, an instream appropriation does not create a physical interference with a senior appropriation right. In addition, to the extent that an instream appropriation is junior to other appropriations, an instream appropriation does not create a legal interference with a senior appropriation right.

The issue then becomes how an applicant can establish noninterference. We find that an applicant can establish noninterference by showing that the sought-after appropriation meets the definition of an instream flow appropriation. That is, the applicant must establish that the appropriation will be (1) an undiverted application (2) of the waters of a natural stream within or bordering upon the state (3) for recreation or fish and wildlife purposes. See § 46-2,108.

In the present case, there is no dispute regarding any of these

three elements. First, CPNRD's applications do not propose any diversion of water from the Platte River. Second, the reaches identified in the applications on appeal are parts of the Platte, undeniably a natural stream within the state. Third, the purpose of the applications is to maintain various types of existing wildlife habitats. We conclude that CPNRD has established that its instream appropriation will not interfere with other senior surface water appropriations.

### (c) Public Interest

Wyoming contends that the director improperly found, under § 46-2,115(5), that CPNRD's applications were in the public interest. Wyoming claims that the director erred (1) in failing to discuss forgone uses and (2) in relying on incompetent evidence.

### (i) Forgone Uses

In order to grant an instream flow application, the director must find that the application is in the public interest. § 46-2,115(5). In order to determine whether an application is in the public interest, "the director shall consider . . . [t]he economic, social, and environmental value of reasonably foreseeable alternative out-of-stream uses of water that will be foregone or accorded junior status if the appropriation is granted." § 46-2,116(2).

At the hearing on CPNRD's application, two witnesses discussed forgone uses. Dr. Raymond Suppalla, an economist, testified on behalf of CPNRD. Dr. Suppalla estimated that 5 percent of CPNRD's applications would constitute water precluded from other reasonably foreseeable alternative out-of-stream uses. Dr. Suppalla's opinion also was embodied in exhibit 49, a report prepared by him and entitled "Analysis of Public Interest Factors for Proposed Platte River Instream Flows." Gary Watts, another economist, testified on behalf of Wyoming. Watts estimated that an additional 17 percent of CPNRD's applications would be precluded from such uses.

In his order, the director discussed Dr. Suppalla's testimony, exhibit 49, and Watts' testimony. The director did not discuss forgone uses. The director concluded that the application is in the public interest.

Wyoming contends that the director is obliged to discuss forgone uses and to document his discussion to the hearing record. The Court of Appeals held that the director was not obliged to document his decision to the hearing record. We hold that the director is not obliged to discuss forgone uses.

Wyoming first argues that the director is obligated to discuss forgone uses as a matter of water law. Wyoming cites as authority Neb. Rev. Stat. § 46-289 (Reissue 1988) and our decision in *In re Applications A-15145, A-15146, A-15147, and A-15148*, 230 Neb. 580, 433 N.W.2d 161 (1988) (*Little Blue III*).

Section 46-289 provides that when the director is called upon to determine whether an application for an *interbasin* transfer is in the public interest, the director must consider certain factors. The statute further provides that the director's order shall contain "a discussion of the required factors for consideration . . . and shall document such decision by reference to the hearing record." § 46-289. In *Little Blue III*, we noted that the director's order discussed the required factors but lacked references to the record.

Both of the authorities cited by Wyoming are inapplicable. Section 46-289, by its own terms, applies only to interbasin transfers. There is no similar statute which requires the director to discuss the factors for an instream flow appropriation. As demonstrated by § 46-289, the Legislature is aware of the desirability of such discussions and is fully capable of requiring such discussions when it so desires. Our decision in *Little Blue III* does no more than reflect the provisions of § 46-289. Moreover, the result in *Little Blue III* turned not on the provisions of § 46-289, but, rather, on the invalid assignment of purported water rights. Thus, Wyoming's appeal to these authorities is without merit.

Wyoming next argues that the director is obliged to discuss forgone uses as a matter of administrative law. According to this argument, the director's findings are inadequate because they fail to disclose a clear basis for the order. This argument directs us to Nebraska's Administrative Procedure Act (APA).

The Department of Water Resources is subject to the APA. *In re Water Appropriation Nos. 442A, 461, 462, and 485*, 210 Neb. 161, 313 N.W.2d 271 (1981). Under the APA, an agency's

order must contain findings of fact and conclusions of law. See Neb. Rev. Stat. § 84-915 (Reissue 1987). "The findings of fact shall consist of a concise statement of the conclusions upon each contested issue of fact." *Id.* The APA imposes this burden on agencies so that reviewing courts can discern why the agency reached its ultimate conclusions. See *Yellow Cab Co. v. Nebraska State Railway Commission*, 176 Neb. 711, 127 N.W.2d 211 (1964).

Our precedents provide considerable guidance as to what sort of findings constitute a sufficient basis for an agency order. An order which does no more than state its ultimate conclusion—"application granted" or "application denied"—clearly fails to provide a sufficient basis for the order. See, *Basin Truck Co. v. All Class I Rail Carriers*, 172 Neb. 28, 108 N.W.2d 388 (1961); *Oakdale Tel. Co. v. Wilgocki*, 171 Neb. 425, 106 N.W.2d 486 (1960); *Skeedee Independent Tel. Co. v. Farm Bureau*, 166 Neb. 49, 87 N.W.2d 715 (1958). An order which fails to make findings on each required element also fails to provide a sufficient basis for the order. See, *Prigge v. Johns*, 184 Neb. 103, 165 N.W.2d 559 (1969); *In re Application of Hergott*, 145 Neb. 100, 15 N.W.2d 418 (1944).

The director's ultimate conclusion with regard to instream flow applications is "application granted" or "application denied." The required elements of this conclusion are listed in § 46-2,115. One of these required elements is that the application must be in the public interest. § 46-2,115(5). Thus, the director's order must explicitly find that the application is in the public interest. Wyoming is arguing, in essence, that a finding regarding forgone uses is a required element of a finding regarding public interest. Section 46-2,116 does not require the director to make a finding regarding forgone uses. If the director is not required to make a finding regarding forgone uses, then such a finding is not a required element of either a finding of public interest or a granting of an application.

The real question, then, is whether the director considered forgone uses. As discussed previously, ample evidence was presented regarding forgone uses—Dr. Suppalla's testimony, exhibit 49, and Watts' testimony. Although it does not discuss forgone uses, the director's order shows that he carefully

examined and weighed Dr. Suppalla's testimony, exhibit 49, and Watts' testimony in order to determine whether CPNRD's applications were in 'the public interest. Unless there is affirmative evidence to the contrary, we will presume that an agency has duly considered all the evidence before it. Accord, *City of Alma v. U.S.*, 744 F. Supp. 1546 (S.D. Ga. 1990); *Lopez v. Industrial Com'n of Arizona*, 162 Ariz. 578, 785 P.2d 98 (Ariz. App. 1989); *Coggins v. Public Employee Relations Board*, 2 Kan. App. 2d 416, 581 P.2d 817 (1978); *Mattison v. City of Signal Hill*, 241 Cal. App. 2d 576, 50 Cal. Rptr. 682 (1966); *Faulkner v. Cal. Toll Bridge Authority*, 40 Cal. 2d 317, 253 P.2d 659 (1953) (in bank). Cf. *Babish v. Babish*, 361 Pa. Super. 118, 521 A.2d 955 (1987) (where record affirmatively showed that hearing officer, in calculating child support, disregarded a worker's compensation award paid to father, the hearing officer failed to consider the award).

The director's order describes his reasoning process. In the order, the director first notes Dr. Suppalla's opinion that the applications were in the public interest. The director next explains that although Watts criticized Dr. Suppalla's methodology, neither Watts nor any other witness had testified that the applications were not in the public interest. Finally, the director remarks that according to Dr. Suppalla's rebuttal testimony, the methodology suggested by Watts would be inappropriate. Accordingly, the director found that CPNRD's applications were in the public interest.

We find that this description of the director's reasoning process provides a sufficient basis for the order. The director was not required to provide, in addition to this description, a discussion of forgone uses.

### (ii) Incompetent Evidence

Wyoming next contends that the director's decision regarding public interest was based on incompetent evidence.

In support of this contention, Wyoming makes the following argument: The director's decision relied heavily on the opinion of Dr. Suppalla, as expressed in testimony and in exhibit 49; Dr. Suppalla's opinion, in turn, relied heavily on the results of a public interest survey. According to Wyoming, the surveyors

asked the survey respondents "to effectively assume that further loss of Platte River water would threaten some wildlife species with extinction." Brief for appellant at 28. The director did not find that denying the requested instream flows would threaten any wildlife species with extinction. Wyoming claims that the premise behind the survey does not comport with reality and that therefore the survey is incompetent evidence. Because the survey is incompetent evidence, Wyoming concludes, neither Dr. Suppalla nor the director was entitled to rely on the survey in order to determine whether the applications would be in the public interest.

The Court of Appeals did not address this argument.

We find that Wyoming has mischaracterized the surveyors' statements. Before asking their survey question, the surveyors said:

> Some persons have suggested that it will economically benefit local areas and states to divert additional water from rivers to irrigate agricultural crops. Other persons fear that loss of river — that further loss of river water will threaten some wildlife species with extinction and further deteriorate the river's potential as a natural recreation source.

The surveyors then asked the respondents, "Would you agree to protect the endangered species of birds and other wildlife and preserve the remaining rivers and natural areas along their shores, even if it meant limiting the additional amount of water that could be diverted from rivers for agricultural use?" The respondents then chose among four answers: strongly agree, agree, disagree, or strongly disagree.

As these quotations demonstrate, the surveyors did not ask the survey respondents to assume that water losses would threaten species with extinction. Wyoming's argument is without merit.

### 2. DUE PROCESS

Wyoming asserts that the director's refusal to subpoena Dr. Ann Bleed and the hearing officer's refusal to disqualify her from participating in the hearing denied Wyoming a fair hearing.

Dr. Bleed is the state hydrologist. Dr. Bleed served as the State's "examining officer" at the hearing. The record reflects that, as examining officer, Dr. Bleed attended most of the hearing sessions and often cross-examined witnesses.

Prior to the hearing, Wyoming submitted a witness list which included Dr. Bleed. One month later, during the hearing, Wyoming filed a praecipe asking the Department of Water Resources to issue a subpoena for Dr. Bleed. The director refused to issue the subpoena, as the hearing officer explained, because Dr. Bleed would be assisting the director in the decisionmaking process.

Two months later, Wyoming moved to disqualify Dr. Bleed, claiming that Dr. Bleed was biased. In its motion, Wyoming argued that Dr. Bleed had coauthored a report which "concluded that instream flows at a rate similar to those being sought by the applicant provide an optimum tradeoff between instream uses for wildlife habitat and out of stream uses." The hearing officer denied Wyoming's motion to disqualify Dr. Bleed. The hearing officer found that the report did not favor any particular plan for river management. The hearing officer also suggested that Dr. Bleed's role in the decisionmaking process was so limited that she could not prejudice the director's ruling:

[B]y statute, the Director, Mike Jess, will make the decision in this matter. Dr. Bleed's role would be specifically limited to offering any type of technical interpretation of the evidence which has been received. Dr. Bleed would not in any way make a decision regarding any of the applications, and I think given the fact that the Director is going to be the sole individual responsible for making the ultimate decision on each and every one of these applications, I'm going to deny Wyoming's motion.

In the Court of Appeals, Wyoming argued that the department's conflicting explanations of Dr. Bleed's role violated due process. Wyoming argued that Dr. Bleed should have been subject to the subpoena and that Dr. Bleed should have been disqualified as an examining officer because she was biased. The Court of Appeals rejected both arguments. The court first addressed the subpoena issue. The court noted that

under the Nebraska Evidence Rules, which applied to the hearing by agreement of the parties, a judge may not be called as a witness. See Neb. Evid. R. 605, Neb. Rev. Stat. § 27-605 (Reissue 1989). The court determined that Dr. Bleed was functioning as the alter ego of the director and, as such, was not subject to a subpoena. The court then addressed the disqualification issue. The court found that the report itself did not reveal any bias on the part of Dr. Bleed. The court suggested that Wyoming could have cross-examined Dr. Suppalla, who coauthored the report with Dr. Bleed, about Dr. Bleed's opinions. The court also suggested that Wyoming could have called other witnesses to establish Dr. Bleed's supposed bias. The court concluded that Wyoming had failed to establish bias and that Dr. Bleed was correctly not disqualified.

Wyoming asserts that the Court of Appeals erred in failing to address its argument that the department's contradictory explanations of Dr. Bleed's role violated due process. The department's contradictory explanations of Dr. Bleed's role did not, in and of themselves, violate due process. If Dr. Bleed should have been subject to a subpoena, then Wyoming was denied due process. If Dr. Bleed should have been disqualified, then Wyoming was denied due process. The Court of Appeals did not err in failing to discuss the contradictory explanations.

### (a) Subpoena for Dr. Bleed

We first discuss whether Dr. Bleed should have been subject to a subpoena.

The Department of Water Resources has the power to compel the attendance of witnesses. § 46-209. According to Wyoming, a Department of Water Resources rule provides that a subpoena " 'will be issued by the Director or Hearing Officer on written request of any interested party . . . .' " (Emphasis omitted.) Brief for appellant at 37, quoting Nebraska Department of Water Resources, Rules of Practice and Procedure, 454 Neb. Admin. Code, ch. 4, § 006 (1989). This rule was not judicially noticed at the hearing. Nebraska appellate courts generally do not take judicial notice of administrative rules and regulations. See, *Dairyland Power Co-op v. State Bd. of Equal.*, 238 Neb. 696, 472 N.W.2d 363

(1991); *Donahoo v. Nebraska Liquor Control Comm.*, 229 Neb. 197, 426 N.W.2d 250 (1988). Wyoming, therefore, has failed to establish that it has a right to have a subpoena issued at all.

Assuming, arguendo, that Wyoming has a due process right to have a subpoena issued, the question remains whether a subpoena should have been issued for Dr. Bleed.

The hearing on CPNRD's applications, by agreement of the parties, was conducted according to the Nebraska Evidence Rules. Rule 605 provides that "[t]he judge presiding at the trial may not testify in that trial as a witness." This rule is identical to rule 605 of the Federal Rules of Evidence. The federal rule was founded, in part, on concerns that the judge would not be able to perform certain judicial functions if the judge took the witness stand:

> The rationale for a rule of incompetency is obvious. When a judge testifies as a witness in a trial at which he presides, his role as a witness is inconsistent with the posture of impartiality which the court is expected to maintain. Permitting a judge to testify raises perplexing questions of who will rule on objections, who will compel answers, what will be the scope of cross-examination, and how counsel is to maintain a proper relationship with the court.

3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Evidence ¶ 605[01] at 605-4 to 605-5 (1993). When the judge is a witness, the judge cannot perform two crucial judicial functions: controlling the presentation of evidence and deciding impartially the merits of the case.

Wyoming correctly notes that Dr. Bleed is not, technically, a judge. We would add that technically, the hearing officer is not a judge and the director is not a judge. Nevertheless, the same concerns which are raised by the prospect of judicial testimony are raised by the prospect of testimony by administrative adjudicators. The hearing officer, the director, and Dr. Bleed are all performing adjudicative functions: the hearing officer is controlling the presentation of evidence, the director is deciding the ultimate outcome of the case, and Dr. Bleed, according to the explanations provided by the department, assists in the

decisionmaking process by providing technical expertise.

Rule 605's unequivocal prohibition of judicial testimony does not neatly fit the realities of agency adjudications because there is no single agency "judge." When the Nebraska Evidence Rules apply to an administrative hearing, those persons performing adjudicative functions are presumptively incompetent to testify. To hold otherwise would enable the parties to remove unwanted adjudicators simply by requesting a subpoena. However, there are limits to an agency's power to shield its employees from a subpoena. An employee with unique knowledge indispensable to the adjudication may be subject to a subpoena. See *American Cyanamid Company v. F. T. C.*, 363 F.2d 757 (6th Cir. 1966) (where parties were charged with improperly influencing a patent officer, who had decided the parties' priority with respect to the claimed invention, the facts were known only to the patent officer, and therefore the patent officer could be subpoenaed to testify as to the alleged misconduct).

In the present case, there is no indication that Dr. Bleed's testimony was crucial to Wyoming's case. There is no claim that Dr. Bleed had any unique knowledge of the facts. There is no claim that the facts were inadequately presented by the witnesses. The record certainly does not lack the testimony of expert hydrologists.

We therefore find that Dr. Bleed was properly excluded from testifying at the hearing. Without a showing that her testimony was necessary, issuing a subpoena for Dr. Bleed would have unduly burdened the decisionmaking obligation of the agency and would have tainted the impartiality of the hearing process.

### (b) Disqualification of Dr. Bleed

We next discuss whether Dr. Bleed should have been disqualified.

Wyoming claims that Dr. Bleed was biased in two ways. First, Wyoming claims that Dr. Bleed favors the specific amount of instream flow requested in CPNRD's applications. Second, Wyoming claims that Dr. Bleed favors instream flows in general. Wyoming cites exhibit 113 as evidence of Dr. Bleed's bias.

Exhibit 113 is a report prepared by Dr. Bleed, Dr. Suppalla, and two others. The report is entitled "Economic, Environmental and Financing Optimization Analysis of Platte River Development Alternatives" and is published by the University of Nebraska. The study upon which the report is based had three general research objectives, one of which was to analyze the economic and environmental tradeoffs associated with alternative uses of the Platte River. To analyze these tradeoffs, the study correlated varying instream flow levels first with environmental consequences and then with economic consequences. The study concluded that instream flow constraints would not dramatically affect net economic returns.

In formal agency adjudications, as in court proceedings, "due process requires a neutral, or unbiased, adjudicatory decisionmaker." 2 Kenneth C. Davis & Richard J. Pierce, Jr., Administrative Law Treatise § 9.8 at 67 (3d ed. 1994). See, also, *Withrow v. Larkin*, 421 U.S. 35, 95 S. Ct. 1456, 43 L. Ed. 2d 712 (1975); *Dieter v. State*, 228 Neb. 368, 422 N.W.2d 560 (1988); *Bockbrader v. Department of Insts.*, 220 Neb. 17, 367 N.W.2d 721 (1985). Administrative adjudicators serve with a presumption of honesty and integrity. *Withrow, supra*; *Dieter, supra*. With these basic principles firmly in mind, we turn to a consideration of the two alleged biases of Dr. Bleed.

First, Wyoming accuses Dr. Bleed of having a specific bias in favor of the amount of flows requested in CPNRD's applications. Wyoming argues that the study sought to identify "optimum instream flows for the Central Platte River in relation to other water users" and that the study "adopted Alternative J . . . as the optimum flow levels." Brief for appellant at 33. Wyoming then notes that the flows requested in CPNRD's applications are "strikingly similar" to Alternative J. *Id*. Alternative J is one of 15 instream flow levels analyzed in the study.

Wyoming's claim that the study adopted Alternative J as the ideal is unfounded. In discussing the economic and environmental tradeoffs, the study notes that Alternative J seems to be a turning point: "The present value of net economic benefit expressed in 1983 dollars remained essentially constant

until instream flow provision 'J' was reached, where they declined . . . ." In summarizing the tradeoffs, the study again makes reference to Alternative J:

> The establishment of instream flow constraints to meet environmental quality needs substantially reduced the aggregate quantity of water diverted under the corresponding optimum development plan. However, net economic returns were not significantly reduced. For example, in comparison to the option of providing no required instream flow, instream flow provision "J" reduced the optimum diversion water quantity by nearly 300,000 acre feet per year but reduced economic returns by only 7.2 percent.

Nothing in exhibit 113 indicates that the study authors designated or selected Alternative J as the ideal or optimum flow level.

To the extent that Dr. Bleed's participation in the study may have caused her to form an opinion as to the optimum flow level, such an opinion is not disqualifying. Although due process requires disqualification when the administrative adjudicator has actually prejudged the precise facts at issue, due process does not require the disqualification of one who has merely been exposed to or investigated the facts at issue. Compare *Cinderella Career and Finishing Schools, Inc. v. F. T. C.*, 425 F.2d 583 (D.C. Cir. 1970) (due process required disqualification of Federal Trade Commission chairman, who, while considering a misrepresentation case, made a speech mixing facts of the case with examples of obvious fraud), and *American Cyanamid Company v. F. T. C.*, 363 F.2d 757 (6th Cir. 1966) (due process required disqualification of Federal Trade Commission chairman, who had ruled upon an issue in a different capacity and had written a letter expressing factual conclusions about the case), with *Withrow, supra* (state examining board, which held an investigative hearing, was not disqualified from holding a "contested" hearing and deciding whether to suspend the doctor's license), and *Dieter, supra* (director, who had made the initial determination to revoke a day-care operator's license based on the recommendation of a licensing supervisor, was not disqualified from making the final

decision to revoke the license). Of course, administrators are not disqualified from deciding a case after remand. See, *Withrow, supra*; *Labor Board v. Donnelly Co.*, 330 U.S. 219, 67 S. Ct. 756, 91 L. Ed. 854 (1947).

Wyoming has not provided any evidence which would suggest that Dr. Bleed has prejudged the ideal level of instream flow for the Platte River. The evidence merely indicates that she has been exposed to and has investigated various instream flow levels.

Second, Wyoming fears that Dr. Bleed has a general bias in favor of instream flows. Wyoming does not cite us to any part of the record which would establish this bias. Exhibit 113 does not establish this bias—the tradeoff analysis reflects only an assumption that both instream and out-of-stream uses are positive and the two uses should somehow be brought into balance.

Even if Wyoming could establish that Dr. Bleed has a general bias in favor of instream flows, such a bias would not be disqualifying. An administrative adjudicator's prejudgment of a law or policy question is not disqualifying. See, *Hortonville Dist. v. Hortonville Ed. Assn.*, 426 U.S. 482, 493, 96 S. Ct. 2308, 49 L. Ed. 2d 1 (1976) ("[n]or is a decisionmaker disqualified simply because he has taken a position, even in public, on a policy issue related to the dispute"); *Trade Comm'n v. Cement Institute*, 333 U.S. 683, 68 S. Ct. 793, 92 L. Ed. 1010 (1948) (commission, which had made a full investigation and report to Congress expressing the opinion that a certain system of selling cement violated the Sherman Act, was not disqualified from instituting proceedings and issuing a cease and desist order against a cement company). If such prejudgments were disqualifying, no judge could try the same issue of law twice. See *id*. To put the case more strongly still: "If . . . 'bias' and 'partiality' be defined to mean the total absence of preconceptions . . . then no one has ever had a fair trial and no one ever will." *In re J. P. Linahan*, 138 F.2d 650, 651 (2d Cir. 1943).

We therefore hold that the Department of Water Resources was not obligated to disqualify Dr. Bleed from assisting in the decisionmaking process. We note that although the Court of

Appeals reached the correct result, its discussion of other sources which Wyoming could have called on to establish bias is mere dicta and should not be cited as precedent.

### III. CONCLUSION

The decision of the Court of Appeals is reversed and the cause remanded so that the director can consider the possible effect the Prairie Bend Project will have on CPNRD's instream flow applications. In all other respects, the decision is affirmed.

AFFIRMED IN PART, AND IN PART REVERSED AND
REMANDED FOR FURTHER PROCEEDINGS.

CAPORALE, J., concurring in part, and in part dissenting.

I agree that the decision of the Department of Water Resources must be reversed in order that the director can consider the effects of the Prairie Bend Project. However, I disagree with the majority's determination concerning Dr. Ann Bleed's participation in this matter.

She not only coauthored a report which involved the central issue the director was to decide and examined witnesses, she may, or may not, have been a part of the decisionmaking process. If she was, her participation as a coauthor of the article on the central issue before the director would entitle a reasonable disinterested observer to conclude that she had in some measure adjudged the facts in controversy. Such a circumstance, arising in an adjudicative setting, would provide a due process basis for disqualifying her as a decisionmaker. See, e.g., *American General Ins. Co. v. F. T. C.*, 589 F.2d 462 (9th Cir. 1979) (decision set aside because one commissioner had previously participated in case as counsel); *Cinderella Career and Finishing Schools, Inc. v. F. T. C.*, 425 F.2d 583 (D.C. Cir. 1970) (public statements of commission chairman indicating some measure of prejudgment, combined with other errors, required vacation of order); *American Cyanamid Company v. F. T. C.*, 363 F.2d 757 (6th Cir. 1966) (one who had served as counsel for Senate subcommittee investigating many of same facts and issues could not sit as commission chairman); *Amos Treat & Co. v. Securities and Exchange Commission*, 306 F.2d 260 (D.C. Cir. 1962), *criticized, National Rifle Ass'n v. U. S. Postal Service*, 407 F. Supp. 88 (D.C. 1976) (one who had

participated as employee in investigation of charges could not sit as commission member).

In view of the department's contradictory characterizations of Bleed's role, the State of Wyoming should have been permitted to depose her in order to determine what that role in fact had been and was to be. I would therefore remand the entire matter for such to be done. If it were to develop that Bleed in fact served as a decisionmaker, I would vacate the entire order of the department and direct that proceedings begin anew.